SAIN *v.* CYPRESS CREEK DRAINAGE DISTRICT.

Opinion delivered December 24, 1923.

1.  DRAINS—VALIDITY OF LEGISLATIVE ASSESSMENT.—Where the Legislature ratified and confirmed assessments already made in a drainage district, this constituted a legislative determination of the correctness and validity of those assessments, which will not be disturbed by the court unless shown to be arbitrary and unfounded.

2.  DRAINS—INJURY TO LANDS—RECOVERY.—Where lands were not taken or appropriated by the construction of a drain, but were merely injured, it will be presumed that the assessment of benefits balanced off the damages against the benefits, so that no separate recovery for such damages can be had.

3.  DRAINS—ACTIONS FOR DAMAGES—LIMITATION.—Under Sp. Act of 1915, No. 80, § 6, providing that the board of directors of a drainage district should award damages to property owners, and that "any property owner shall be presumed to have acquiesced in the action of the board unless he gives the board notice in writing of his objection" within thirty days, and unless he asks for a jury trial within a designated time, *held* that the failure to appear and demand the right of trial by jury for the ascertainment of the amount of compensation for the property taken was conclusive of the right to maintain an action later for the recovery of damages.

Appeal from Desha Circuit Court; *T. G. Parham,* Judge; affirmed.

*Williamson & Williamson,* for appellant.

1.    The liability upon which appellants rely is found in the formation of the drainage district by the Legislature, and in the construction thereof in conformity with the requirements of the act, and is based upon the provisions of the State Constitution, art. 2, § 22, and of the United States Constitution, art. 14, § 1.    As a necessary result of the construction authorized and directed by the Legislature, there was an actual taking of the lands of the appellants.    140 Ark. 241; 15 Ann. Cases 909; 94 Fed. 613, 36 C. C. A. 418; 128 Fed. 125; 236 Ill. 36; 15 Ann. Cases 904-908; 188 U. S. 446; 23 Sup. Ct. Rep. 349; 149 Ark. 15.    This court has repeatedly held that the Legislature cannot arbitrarily declare property benefited which naturally cannot be, and that it cannot arbitrarily so tax lands as to amount to a confiscation of property without benefit.    147 Ark. 181; 152 Ark. 573; 89 Ark. 513; 118 Ark. 294, 300.

2.    The circuit court has jurisdiction to enforce liability in cases of this kind.    140 Ark. 241, 247-248.

3.    No limitation has run against appellants in these suits.    The cause of action accrued when, and limitations did not begin to run until, canal No. 19 was constructed in 1919.    157 Ark. 125; 92 Ark. 406.

4.    The liability in these suits is not concluded by the legislative assessment in 1915.    The attempted assessments, notices and actions prior to June 23, 1913, were adjudicated to be a nullity.    They deprived the appellants of nothing.    109 Ark. 60.    The lower court erred in going out of the pleadings and declaring that, by the act approved February 25, 1915, the Legislature ratified the assessment, etc., and that the board of commissioners made due allowance for damages to plaintiffs in determining the benefits to the tract as a whole, making a reduction to that extent in the total benefits assessed against the whole tract, etc.    149 Ark. 15; Page & Jones, Taxation by Assessment, vol. 1, p. 67; 66 Minn. 161. See also 140 Ark. 241; 147 Ark. 191, 194; 83 Ark. 54:

5. Appellants are not concluded by the chancery decree.

·6. Appellants are not concluded by any statutory notice. The only legal evidence of the notice and its publication must be found, if at all, in the record of the board. Act No. 80, Acts 1915, p. 309, § 4; *Id.* p. 303, § 3; Act No. 455, Acts 1911, p. 1231, § 2; 55 Ark. 218, 221. Since the record does not show this notice, nor that the board fixed a day for the hearing, the notice and subsequent proceedings are void. 127 Ark. 165, 168; 64 Ark. 556, 569; 135 Ark. 528; 154 Ark. 46.

*DeWitt Poe, E. E. Hobson* and *Coleman, Robinson & House,* for appellee.

1. Appellants are concluded by the Legislative assessment. Acts 1915, p. 309, § 2; 220 S. W. 56; 83 Ark. 344; 112 Ark. 357; 107 Ark. 285; 133 Ark. 122; 100 Ark. 369; 108 Ark. 421.

2. They are concluded by the consent decree. Acts 1915, pp. 309, 310, § 5. This is a collateral attack both upon the assessment of benefits and on the chancery decree, which cannot be maintained. 151 Ark. 484; 139 Ark. 168; *Id.* 277; 144 Ark. 632; 147 Ark. 469.

3. They are concluded by the finding of the board of commissioners that the lands were not damaged, and by their failure to assail this finding in the manner and within the time prescribed by law. Act 1915, § 6 *et seq*; 138 Ark. 477.

4. Appellants are concluded by the court's finding of facts. 114 Ark. 170; 126 Ark. 587; 90 Ark. 512; *Id.* 494; *Id.* 371; 91 Ark. 108; 92 Ark. 41; 100 Ark. 166.

McCULLOCH, C. J. Cypress Creek Drainage District, composed of a large area embracing certain lands in Chicot, Desha and Drew counties, was created by special statute in the year 1911 for the purpose of constructing drains to relieve the lands in the district from accumulated waters. Theretofore the surface water from a considerable portion of the area included in this district had drained into the Mississippi River through

Cypress Creek, and, in order to protect the lands from the Mississippi River overflow in times of high water, it was desired to close up the gap in the levee by damming up the levee across the mouth of Cypress Creek, and, in order to provide other means of draining this area, this district was created under a plan to carry the surplus waters in another direction; that is to say, to gather them up and carry them through a main drainage canal to the head of another stream, called Bayou Macon, through which the waters would be carried south, parallel with the Mississippi River, into Chicot County. Plans were formed for the construction of the improvement, and assessments of benefits to the lands in the district were made, but, in litigation which arose between the district and certain landowners, before further progress had been made in the affairs of the district, it was decided that the plans exceeded in scope the authority conferred by the statute creating the district. *Cypress Creek Drainage District* v. *Wolfe,* 109 Ark. 60. After that decision was rendered, further legislation was found necessary to give authority for the construction of the improvement which would be adequate to the demands of the situation, so the General Assembly of 1915 enacted a statute (Acts 1915, p. 297) amending the original statute creating this district by enlarging the powers with respect to the extent of the improvement to be constructed, and, among other things, it was provided in that statute (§ 5) "that the assessment of benefits heretofore made by said district, as the same appears upon the assessment books therefor, is just and equitable, and the same is hereby confirmed and declared to be the assessment of benefits of said district." The improvement was then constructed in accordance with the plans, which contemplated the construction of a large ditch, or canal, beginning in the northern portion of Desha County and running thence southerly about nineteen miles to the head of Bayou Macon, thus gathering up the surface waters and waters which drained through

Cypress Creek and other streams and carrying them into the head of Bayou Macon, through which they flowed, as before stated, southward.

The plaintiffs (appellants) are owners of lands included in said district which abut on Bayou Macon, and they instituted separate actions at law (fifteen in number) against the district, to recover damages alleged to have been caused by the flooding of portions of their lands which abut on Bayou Macon. It was alleged in the complaint, in each of the cases, that, by the construction of the main canal and other ditches and drains, the defendant district had diverted the waters of other creeks and streams, which were natural watercourses and carried large volumes of water, from their usual and ordinary courses into Bayou Macon, causing that stream to "overflow its banks and spread out over large quantities of plaintiff's land, overflowing said land belonging to the plaintiff which was never overflowed before, and overflowing other lands belonging to plaintiff much quicker than was ever done before said ditch was constructed, and causing the same to remain inundated for a much longer period of time, resulting in permanent injury to the land of plaintiff, which injury became apparent after the construction of said ditch."

There are also allegations in each of the complaints, which are supported by the evidence, that the volume of water passing through Bayou Macon was greatly increased by reason of the construction of the drainage canal which emptied into the head of that stream, and that, prior to the construction of the canal, Bayou Macon carried only a small volume of water; that on each side of the bayou the banks were sloping, thus forming a low-lying area, or terrain, between the first bank or water's edge and the second bank, or, as expressed by some of the witnesses, the "ultimate bank," and the allegations as to overflowing of the lands of the abutting owners relate to portions of the land which thus lie between the first and second banks.

The evidence shows that, prior to the construction of the drainage canal in question, these lands were subject to cultivation, and were in fact cultivated from year to year, and rarely ever overflowed, but that, since the construction of the canal and the increased volume of water carried through the bayou, the lowlands between the two banks overflowed with such frequency as to prevent the cultivation of crops.

In each of the cases an answer was filed, tendering issues hereinafter discussed, and all of the cases were consolidated and tried together before the court sitting as a jury. After hearing the evidence, the court found the facts against the plaintiffs, and decided against them. Judgment was rendered accordingly, and appeals have been prosecuted to this court by all of the plaintiffs.

Counsel for the district present two grounds upon which liability now asserted should be denied and the judgments affirmed.

1. The anticipated benefits to the whole of the tracts of land owned by each of the plaintiffs, including the lands now claimed as those damaged by the overflow, were assessed in accordance with the original statute creating the district, and, as has already been referred to, there was a section of the statute enacted in 1915 (*supra*) ratifying and confirming those assessments. This constituted a legislative determination of the correctness and validity of those assessments, which will not be disturbed in a judicial review unless shown to be arbitrary and unfounded. *Sudberry* v. *Graves,* 83 Ark. 344; *Salmon* v. *Board of Directors,* 100 Ark. 369; *Alcorn* v. *Bliss-Cook Oak Co.,* 133 Ark. 118; *Gibson* v. *Spikes,* 143 Ark. 270. There is no attempt in the present litigation to attack the correctness of those assessments of benefits, but the contention is that, irrespective of the assessment of benefits, the plaintiffs are entitled to recover for damages to their lands, or, rather, to recover for the value of the lands, which they contend has in

effect been taken in the operation of the improvement. That contention will be discussed later.

The same section in the act of 1915 (*supra*) which confirmed the assessment of benefits contains a further provision as follows:

"All persons claiming that their lands would not be benefited by the making of the improvement contemplated by this act are hereby required to apply to the proper court of chancery, within sixty days after the passage of this act, to enjoin the enforcement of said assessment; and any person failing so to apply to the court of chancery within said sixty days shall be forever barred from contesting the assessment of benefits aforesaid."

The plaintiffs and other landowners in the district instituted an action in the chancery court of Desha County within sixty days after the passage of the act of 1915 (*supra*), attacking the correctness of the assessments, and a final decree was rendered in that cause substantially reducing the assessments of benefits on all of the lands of the plaintiffs. The contention of the plaintiffs is that the assessments of benefits and the former suit in the chancery court relating thereto included only benefits to the lands in the district and had no reference to injury to the lands in the operation of the drainage project, which, in effect, constituted taking of property, and that, notwithstanding the finality of the assessment of benefits as adjudicated in the chancery court, the plaintiffs still have a right to maintain an action at law to recover compensation for the injury to their lands which, in effect, constituted a taking. The contention of the district is, on the contrary, that the lands of the plaintiffs were not actually taken and used in the construction and operation of the drainage project; that there was only an injury to the land by reason of the construction of the improvement, which was taken into account in the assessment of benefits, the one being balanced off against the other, and that the conclusive

effect which must be given to the assessment of benefits and the litigation which finally adjudicated the matter constitute a bar to the right of plaintiffs to recover damages.

The Constitution of this State provides that "private property shall not be taken, appropriated, or damaged for public use, without just compensation therefor." Art. 2, § 22. The constitutions of some of the States differ from ours in that the guaranty of compensation extends only to property taken for public use, without expressly providing for compensation for property damaged. Such is the form of the provision in article 5 of the Constitution of the United States. In some of the decisions on this subject it has been held that constitutional provisions guaranteeing compensation merely for the taking of property only include damages for injuries resulting from an invasion or destruction of the property, and not merely an incidental injury; but decisions of other courts, including the Supreme Court of the United States (*United States* v. *Lynch,* 188 U. S. 446), hold that the constitutional guaranty relates to compensation for any injury done to property for public use. Of course, our Constitution involves no such distinction, for it expressly guarantees that compensation shall be paid for property either "taken, appropriated or damaged for public use." It is undeniable that the kind of injury which the plaintiffs claim they sustained to their property, and which the testimony tends to show, is protected by the constitutional guaranty. There is no controversy here over that question, but the point involved relates to the manner in which such compensation must be ascertained, adjusted and paid.

The Supreme Court of the United States, in the case cited above, and upon which learned counsel for plaintiffs rely with so much confidence, holds that the injuries to the property, or its destruction for public use, constitute a taking within the constitutional guaranty, but this

decision has no relation to the question how the compensation may be paid, nor to the question, more directly involved in the present discussion, whether or not the incidental damage to the property in the construction of the improvement, regardless of its extent, may or may not be balanced off against the benefits which are to be derived. The law on that particular subject has, we think, been fully settled by the decision of this court in *Gregg* v. *Sanders,* 149 Ark. 15. In that case a levee district was formed for the purpose of constructing a levee along White River, and the plaintiff in the case was the owner of a tract of land abutting on the river, a portion of which was actually taken and used in the construction of the levee. In a suit by the plaintiff to recover damages for the land so taken it was contended, on behalf of the district, that such damage should be balanced off and deducted from the appraised benefits to accrue to the remainder of plaintiff's tract of land. We held against that contention, and in doing so we drew a distinction between lands actually taken and used and. those which were merely damaged incidentally in the construction or operation of the improvement. In disposing of the question we said:

"The theory upon which rests the proceedings for the construction of local improvements by the imposition of special assessments on contiguous property is that the improvement is public in.its nature to the extent that the right of eminent domain may be authorized, but it is local to the extent that special benefits accrue to the adjoining property. The improvement is paid for out of special assessments based on such benefits, and when property is taken for use in the construction of the improvement, full compensation must be awarded in order to satisfy the requirements of the Constitution, without deduction of the benefits which are to accrue to the owner on the remainder of his property. Damages to the property not taken may, however, be balanced off against the benefits which accrue, for damages must

necessarily be taken into account in the estimate of benefits.''

Discussing the question further in the same case, we said:

"At any rate, we are convinced that the true rule is that, whether the taxes levied amount to the appraised benefits or not, there can be no deduction of any part of the benefits from the compensation to be allowed to a property owner for that portion of his property which is taken and used in the construction of the improvement, for the reason that he pays for his benefits in taxes, the same as other property owners, and it would destroy the rule of equality to require him to contribute to the common use any part of his property without compensation.''

Counsel for appellants contend that the undisputed proof shows that the value of the property was totally destroyed, so that it constituted a taking of the property within the meaning of the law, and that the case of *Gregg* v. *Sanders, supra,* supports their right to recover damages in the present cases. In the first place, it may be said that there is a conflict in the testimony, and a finding of fact against them by the trial court, which is binding upon this court on appeal. The trial court found from the evidence that the damage to the lands of the plaintiffs was actually considered by the assessors in making the assessment of benefits. In addition to that, we are of the opinion that, according to the undisputed evidence, the property was not actually taken and used by the district in the operation of the project so as to separate it from the other lands of the plaintiffs and prevent the damage being balanced off against the benefits. The only portions of the land taken for the purpose of constructing the improvement were the lands covered by the drainage ditch. The waters were gathered up and thrown into Bayou Macon, but the incidental injury to lands abutting on Bayou Macon did not constitute a taking of those lands, though it resulted in injury for

which compensation must be made within the meaning of the Constitution. The lands were frequently overflowed, but they remain the property of the plaintiffs for the enjoyment of such limited use to which they were susceptible in the damaged condition. Suffering the damages thus inflicted did not constitute a contribution of private property to public use in the sense that that portion of the land was separated from the remainder so as to prevent the balancing off of said damage against benefits to the whole of the lands. We think that the facts of the case bring it within the rule announced in *Gregg* v. *Sanders, supra,* and that the assessment of benefits, including the estimate of damages, was conclusive of the rights of plaintiffs to recover compensation. In other words, the finality of the assessment raises a conclusive presumption that they had been compensated by having the damages balanced off against the assessments of benefits.

2. It is equally plain that the plaintiffs, except possibly plaintiff R. H. Wolfe, are barred from recovery of damages on still another ground, now stated. The act of 1915 (*supra*) contains the following provision (§ 6):

"Said board shall obtain rights-of-way for its drains, ditches, canals, levees and dams without cost to the district, wherever possible, and it is empowered to make all necessary contracts for the acquisition of such rights-of-way. They shall have power to adjust and pay all damages that may accrue by reason of such drains, ditches, canals, levees and dams. Any property owner may accept the damages awarded to him by the board, or acquiesce in its failure to award damages in his favor, and shall be presumed to have acquiesced in the action of the board unless he gives said board notice in writing of his objection to the award made him, or the action of the board in failing to award him damages, within thirty days after the action of the board thereon."

This provision relates to the value of property actually taken and used and also any property which may necessarily be destroyed in the construction of the improvement, and if the injury to plaintiffs' lands constitutes what they contend it to be, it falls squarely within this provision for the adjustment and payment of damages in the manner specified. The same section provides that, as soon as the board has determined upon the system of drainage and the award of damages to be made, it shall publish a notice, and the form of that notice is set forth in the statute. Another provision of the same section is as follows:

"Any one who shall appear, and shall feel aggrieved at the action of the board on his complaint, shall, within five days after said meeting, file written notice with the board that he demands an assessment of his damages by a jury, and in such instances the board shall institute in the circuit court, in the county in which the lands lie, an action to condemn the lands that must be taken or damaged in the making of any proposed drain, ditch, canal, levee or dam."

It appears from the record in the present case that such an ascertainment of damages was made, or at least that the board formally ascertained that there were no damages to lands not actually taken in the construction of the canal, and that notice was duly published in accordance with the terms of the statute. Plaintiffs did not respond to the notice nor pursue the remedy pointed out in the statute. There is some evidence in the record to the effect that plaintiff, R. H. Wolfe, presented a claim for damages to the commissioners, but as he too must be denied further relief on the first ground herein stated, it is unnecessary to decide whether his claim constituted a demand for trial by jury within the provisions of the statute.

In the case of *Dickerson* v. *Tri-County Drainage District,* 138 Ark. 471, there was involved the procedure under a statute identical with the one now under consid-

eration, and we held that the statute was valid, and that (quoting from the syllabus), "where the Legislature provides a method for ascertainment of compensation to be allowed owners of land taken under eminent domain for construction of drainage ditches, the constitutional guaranties are complied with." In that case it was alleged that the plaintiff's land was actually taken and used in the construction of the drainage ditch, and we held that the failure to appear and demand the right of trial by jury for the ascertainment of the amount of compensation for the property taken was conclusive of the right to later maintain an action for the recovery of damages. The decision in that case is conclusive of the present one, for the statute is the same, and the facts were less favorable to the plaintiff than those disclosed in the present case.

Counsel for appellants rely on *Road District* v. *Hall*, 140 Ark. 241, as disclosing the distinction which exists in the present case from our decision in the Dickerson case, *supra*. The distinction found in the Hall case does not exist in the present case, for in that case there was a change of plans, subsequent to the assessment of benefits, whereby the road to be improved was widened, and the decision involved the question of recovery of compensation for property taken, subsequent to the assessment of benefits, for the widening of the road. There is no such distinction in the present case, for there has been no change in the plans and no additional taking or damage to the property further than the recurring injuries resulting from the frequent overflows. This damage was one which was in contemplation at the time the plans were formed to gather up the waters and cast them into Bayou Macon, and this, according to the findings of the court and the evidence adduced in the case, was taken into consideration by the board of assessors in assessing the benefits. Whether such damages were, in fact, taken into consideration, is immaterial,

for they should have been taken into consideration, and the failure of plaintiffs to complain in the manner provided in the statute bars them from the subsequent assertion of any claim for damages.

Our conclusion on this point is, as on the other one already stated, that the plaintiffs are not entitled to recover damages, and that the judgment of the circuit court was correct. The judgment is therefore affirmed.

Wood, J., disqualified.

### DISSENTING OPINION.

Hart, J.   My dissent is based upon the fact that I believe that practically the undisputed facts bring this case within the principles of law decided in the following cases: *Road District No. 6.* v. *Hall,* 140 Ark. 241; *United States* v. *Lynch,* 188 U. S. 445, and *Pumpelly* v. *Green Bay Co.,* 13 Wall. (U. S.) 166.

In the last mentioned case Mr. Justice Miller made a clear and comprehensive statement of the principles of law as follows:

"It would be a very curious and unsatisfactory result if, in construing a provision of constitutional law, always understood to have been adopted for protection and security to the rights of the individual as against the government, and which has received the commendation of jurists, statesmen, and commentators as placing the just principles of the common law on that subject beyond the power of ordinary legislation to change or control them, it shall be held that, if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent, can, in effect, subject it to total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use. Such a construction would pervert the constitutional provision into a restriction upon the rights of the citizen, as those rights stood at the common law, instead of the government, and make it an authority for invasion of private right under

the pretext of the public good, which had no warrant in the laws or practices of our ancestors.''

In the application of this principle of law I think the evidence for the defendant shows that the damage done to the lands of the plaintiffs was caused by a change of the plans under which the drainage ditches were constructed by the commissioners.

O. G. Baxter was a civil engineer for the United States Government, and had charge of the surveying, and was responsible for the designing of the plans of the Cypress Creek Drainage District. He was a witness for the defendant. On the subject of a change of the plans I quote from his testimony on pages 430, 431 and 432 of the transcript as follows:

''Q. Describe to the court the natural drainage of this territory prior to the organization of the Cypress Creek Drainage District, and explain the plan with reference to converting that natural drainage into a proper system of artificial drainage to take care of this water when the gap was closed? A. The upper part of the district was drained by Cypress Creek, the headwaters beginning about twelve miles southeast of Pine Bluff and extending parallel to the Arkansas River, and entering the Mississippi River just below the mouth of the Arkansas. The drainage south of Amos Bayou was southerly through natural channels, and the closing of the gap necessitated providing for a new outlet for this Cypress Creek water, and plans were prepared and filed providing for carrying the Cypress Creek water to the south, down into Chicot County, through Boggy Bayou, which was called ditch 81, and through ditch 43, which was the middle ditch, down through the center of the district, and ditch No. 19, which takes the water from the upper portion of the district down through Bayou Macon to Macon Lake, in Chicot County, and ditch No.18, which provides drainage for the Little Bayou Macon, and ditch No. 13, which takes care of the Wells Bayou watershed, together with the various lateral ditches shown on this map (referring to map), covering the whole of the territory

included in the district. Q. Prior to the organization of this district was Bayou Macon a natural waterway? A. Yes sir.''

Again I quote from his testimony on pages 435, 436 and 437 of the transcript as follows:

''A. The water level from the head of the Cypress Creek, ditch No. 19, Walnut Lake region, has been raised two feet, and from Walnut Lake to a point where ditch 13 is supposed to enter Bayou Macon, which is in the east quarter corner of section four (4), township twelve (12) south, range three (3) west, has been raised three feet from what it would have been if the Kirsch Lake Drainage District had not cut across the natural divide of Choctaw Bayou, in Lincoln County, and carried fifty square miles of headwater into Cypress Creek, that would have been carried down through Wells' Bayou; and the failure to construct ditch No. 13 from Walnut Lake to the east quarter of .section four (4), township twelve (12) south, range three (3) west, had brought in seventy-six more square miles into Bayou Macon, due east of Walnut Lake, that otherwise would have gone down below. So, from. the head of ditch No. 19 to a point about nine miles down Bayou Macon, we have three feet higher water than we would have had if the plans had been carried out according to design. Q. Where does the Kirsch Lake Drainage District lie with reference to the Cypress Creek Drainage District? A. The Kirsch Lake District is on the northwest. Q. On the northwest? A. Yes sir. Q. Is it immediately contiguous to the Cypress Creek Drainage District on the northwest? A. I think part of it is. Q. Now, that district is cut through the natural divide and empties its waters into the ditch system of Cypress Creek Drainage District? A. Yes sir. Q. What is the area of water that is thereby turned into Cypress Creek that does not come from the territory of Cypress Creek at all? A. Well, let's see. Fifty square miles, which would eventually come to Cypress Creek down below, but not at the point where it would put fifty square miles at the head, and

one hundred and twenty-six square miles from Walnut
Lake down.  Q. What effect will the completion of this
plan have on the efficiency of the district to take care of
this additional water that has been wrongfully put into
the district?  A. The completion of the plans—the com-
pletion of this clearing down Bayou Macon will give us
relief down Bayou Macon, but of course from the point
above ditch No. 13 we will still have higher water than
we planned.  Q.  And that is due to the water that the
Kirsch Lake District has turned into Cypress Creek?
A. Yes sir, and the failure to cut ditch No. 13."

C. H. Miller was employed by the drainage district
as a consulting engineer, and was a witness for the
defendant.  On this same subject I quote from his evi-
dence on pages 497, 498 and 499 of the transcript as
follows:

"Q.  Do you know when the water from Kirsch
Lake Drainage District was diverted into Bayou Macon?
A. In a general way.  I wasn't here at the time.  I was
here in 1917, or the early part of 1918.  Q.  The original
plans of the Cypress Creek District did not contemplate
taking care of any of the water which the Kirsch Lake
District dumped into the Cypress Creek Drainage Dis-
trict, did it?  A.  Not at that point.  They contemplated
taking care of that water down below the point where
this land is located.  It would have finally come into
Bayou Macon.  Q. But it would have come into Bayou
Macon, had the original plans of the Kirsch Lake Dis-
trict been carried out, below the location of the lands in
suit?  A.  Yes sir.  Q.  But the act of Kirsch Lake Drain-
age District in dumping their water into Cypress Creek
at a different place affected the lands in suit?  A.  Yes
sir, it resulted in throwing more water into the ditch
where these lands are located.  Q.  That is what I mean?
A.  Yes sir.  Q.  It raised the flood level on this land by
putting additional water on them?  A.  Yes sir.  Q.  Mr.
Miller, do you know whether or not the plans for the
Kirsch Lake Drainage District called for a discharge
ditch at a place that would carry this water into Bayou

Macon below the lands in the suit—the original plans
called for that? A. I don't recall very well about that.
The Cypress Creek Drainage District plans were made
so as to take care of the Kirsch Lake water at the lower
end of that district. Q. The point I am asking is this:
Didn't the plans of the Kirsch Lake District also call
for a ditch, in conjunction with the plans of the Cypress
Creek Drainage District, to take care of the water you
have mentioned? A. I think so. I am not sure. Q. But
the Kirsch Lake District afterwards dug an additional
ditch not called for in the plans at all? A. Yes sir, I
know that. Q. And this threw the water of the Kirsch
Lake District on the lands in suit, where it wouldn't have
done that if they had followed the plans of the district?
A. Yes sir, that is a fact.''

Hubert Furr was one of the commissioners, and on
the same point I quote from his testimony, on pages 521
and 522 of the transcript, the following:

''Q. If Kirsch Lake District had drained down
ditch No. 43, as contemplated, would the lands in suit
have received as much water as they do? A. Kirsch
Lake District wasn't ever contemplated to go down
ditch 43. It was originally planned to go down Bayou
Bartholomew to ditch 13. Q. That is what I mean?
A. Yes sir. Well, it was a part of the original plans of
Cypress Creek to dig number 13, but 13 was abandoned,
then the Kirsch Lake District changed their plans, and,
instead of turning their water into Bayou Bartholomew,
they diverted it into ditch number 19 at the north of the
Desha County line. That put an additional amount of
water into Bayou Macon? A. It turned the water they
had planned from Kirsch Lake District to go into No. 13,
but when No. 13 was abandoned they turned it in, about
fifteen miles higher up, into Cypress Creek Drainage
District, and thereby increased the volume of water in
the upper waters of Bayou Macon. A. Yes sir.''

The testimony of those witnesses shows conclusively
that the damage to the lands of the plaintiff was caused
by a change of the plans under which the drainage ditches

were constructed.  It was known from the beginning that the Kirsch Lake Drainage District was being formed and that the water from it must flow into some of the ditches or bayous of the Cypress Creek Drainage District.  The Kirsch Lake Drainage District was adjacent to the Cypress Creek Drainage District, and northwest from it. The waters from the ditches in the territory comprising it flowed in a general southeasterly direction, and would necessarily flow into the territory of the Cypress Creek Drainage District.

It was first intended to construct what was called ditch No. 13, in the Cypress Creek Drainage District, for the purpose of receiving the waters which flowed out of the Kirsch Lake Drainage District.  Drainage ditch No. 13 would carry the waters from the Kirsch Lake Drainage District to a point about 15 miles below the lands of the plaintiffs and there empty the waters into the drainage ditch, or canal No. 19, which was the main drainage ditch of the Cypress Creek Drainage District.

The landowners in the Cypress Creek Drainage District contested the assessment of benefits against their lands, and their contention was sustained by the chancery court, which held the assessments to be void.  The decision of the chancellor was affirmed by this court, in an opinion delivered on June 23, 1923, reported in 109 Ark. 60, under the style of *Cypress Creek Drainage District* v. *Wolfe.*

This caused an amendment to be made to the statute creating the Cypress Creek Drainage District by an act of the Legislature, approved Feb. 25, 1915.  Acts of 1915, p. 297.

By the provisions of § 3 of this act the construction of ditch or canal No. 13 was made optional with the landowners of part of the territory embraced within the boundaries of Cypress Creek Drainage District.

By § 5 of the act it was recognized that the taxes of the district upon a portion of the land had been enjoined by the chancery court of Desha County on the

ground that the lands in question would not be benefited by the drainage system contemplated in the act.

The Legislature declared that, according to the plans under contemplation by it, the lands would be entirely reclaimed from surface water, or put within easy reach of reclamation. The assessments of benefits theretofore made was thereupon confirmed, including those as to which the collection of taxes had been enjoined. No attempt was made to construct canal No. 13 under the provisions of this act. Hence it became necessary for the commissioners of the Kirsch Lake Drainage District to find another outlet for the waters flowing from that district. This was done by digging a canal in a generally eastern direction, so that the waters would flow into canal No. 19, which was the main canal in the plans of the Cypress Creek Drainage District, above the lands of the plaintiffs, and thereby caused them to overflow, as testified to by the witnesses for the plaintiffs and also by the engineers for the defendant, as shown by their testimony as copied above.

The original assessments were made upon the theory that the waters from the Kirsch Lake Drainage District would empty into canal No. 13; which would, in turn, empty into canal No. 19 about fifteen miles below the lands of the plaintiffs. No. 19 flows into Bayou Macon, and I have referred to them as No. 19. The Legislature confirmed the original assessments upon this theory.

A subsequent change in the plans by emptying the waters from the Kirsch Lake Drainage District into canal No. 19 above the lands of the plaintiffs, instead of below them, caused their lands to overflow for a greater part of the year, so that fertile lands which, before the construction of the drainage canal, had been very valuable for cultivation in cotton, became worthless except for pasturage. Therefore, instead of benefiting the lands of the plaintiffs, the construction of the drainage system caused their lands to be greatly damaged.

The testimony of the witnesses for the defendant shows that this change of the outlet of the waters from

the Kirsch Lake Drainage District was done in 1919 and 1920. As we have already seen, it was evidently done after the passage of the act in 1915 amending the act under which the drainage system was originally planned. If so, then the damage caused by the change of the plans could not have been considered by the commissioners in making the original assessments or by the Legislature in 1915 in confirming the same. It necessarily follows that the damage was caused to the plaintiffs' lands by a change of plans made after the act of February 25, 1915, was passed; the case falls squarely within the principles of law decided in *Road District No. 6* v. *Hall,* 140 Ark. 241.

Therefore I think that the opinion of the majority is wrong, and respectfully dissent.