## ST. LOUIS UNION TRUST CO. et al. v. FRANKLIN–AMERICAN TRUST CO.* et al.

### No. 9116.

Circuit Court of Appeals, Eighth Circuit.
Aug. 24, 1931.

*Certiorari granted 52 S. Ct. 129.

432

Henry Davis, of St. Louis, Mo. (Thomas S. McPheeters, Rhodes E. Cave, and Bryan, Williams, Cave & McPheeters, all of St. Louis, Mo., on the brief), for appellant St. Louis Union Trust Co.

Walter G. Riddick, of Little Rock, Ark. (Charles T. Coleman, of Little Rock, Ark., on the brief), for appellant M. H. Rorick.

George B. Rose, of Little Rock, Ark. (D. H. Cantrell, J. F. Loughborough, A. W. Dobyns, and A. F. House, all of Little Rock, Ark., on the brief), for appellees.

Before STONE and GARDNER, Circuit Judges.

STONE, Circuit Judge.

The Cypress Creek drainage district issued four series of bonds. The first was issued under authority of two special acts of the Legislature of Arkansas, passed in 1911. The second issue was under a special act passed in 1915, and the last two issues were under two special acts passed in 1919 and 1921. The district came into default on all of these issues. Proceedings were begun by the trustees of the first and second issues to enforce the payment of the bonds and the issues in the case finally developed into a contest of rights of priority between the first issue, the second issue, and the third and fourth issues. M. H: Rorick, holder of bonds under the first issue, intervened, contending for the priority of the first issue. The second issue conceded the priority of the first issue, but claimed a priority over the third and fourth issues. The third and fourth issues claimed a parity of all four issues. The court made findings of fact and stated conclusions of law to the effect that all four issues were upon a parity without any rights of priority as to any one of them. From that determination, Rorick, representing the first issue, and the trustee under the second issue bring this appeal.

The matters presented upon this appeal have to do with certain stated conclusions of law and certain findings of fact of the court below, but, in the last analysis, all involve but one general question, which is the proper construction to be given the above special acts under which these several issues of bonds were made.

In 1911, the Legislature passed two special acts designated as Special Act No. 110 (page 260) and Special Act No. 455 (page 1227). The first act created this district. The second act amended the first act, and nothing was done until after the second act, so that we need concern ourselves only with Act No. 110, as amended by Act No. 455. Under these acts, the location and purpose and, generally speaking, the extent of the improvement contemplated to be brought

about by the district are set forth as follows: "The intent and purpose of this Act being to open up and make a drainage canal from the Lincoln County line to Boggy Bayou, and of Boggy Bayou from the Government levee to Clay Bayou, in Chicot County, and the work from Boggy Bayou on down shall be completed before the Government is asked to move its Boggy Bayou levee. The board shall, as soon as practicable after the passage of this Act, employ a competent engineer and other employees and make a complete survey of said district from Lincoln County line to said bayou in Chicot County, and said engineer shall make all necessary maps, profiles, and furnish other information showing the size of the canal required for the purpose of this Act; said information to show the yardage of earth to be removed and other work required, and so complete in every detail to enable the board to advertise for bids. The work shall be let to the lowest responsible bidder, who shall give bond in such amount as the board may determine. The board shall make such rules and regulations as it may deem necessary for the speedy completion of said work. The board shall provide in like manner for the opening and constructing a ditch or canal from the Lincoln County line to Boggy Bayou. After the completion of the main ditches or canals, as above set forth, it may construct such general or main laterals as will be of general benefit to the community, out of the funds in its hands for the surplus sum, if there be a surplus." Act No. 455, § 2, Acts of Ark. for 1911, p. 1229.

Section 12 of the same acts (page 1240) provided for the issuance of bonds, as follows: "For the purpose of constructing, completing and maintaining the drains, ditches and canals contemplated by the act, and in order to enable the board of directors to further carry out the purposes of this Act, the said board shall have power to borrow money from time to time at a rate of interest not exceeding six per cent per annum, and to that end may issue negotiable bonds of said district, to an amount not exceeding $300,000.00, payable in lawful money of the United States, at such time and place, and in such denominations as the board may prescribe. Said bonds so issued by said board shall be signed by the president, and countersigned by the clerk, and the seal of the district attached thereto. The board is hereby required to set aside annually from the first revenues collected from any source whatever, a sufficient sum to pay the interest for that year on all outstanding bonds, and any installment of principal that may become due in that year, and for the purpose of securing the payment of said bonds and interest, a lien is hereby charged on all lands, lots, railroad embankments and tramways in said district, paramount to all other liens except other taxes."

A portion of section 13 (page 1240) provided as follows: "For the prompt payment of bonds and coupons the entire revenues of the district arising from any and all sources are pledged, and for the purpose of paying said bonds and coupons, said board may execute an instrument of pledge in due form of law."

Section 14 (page 1243) provided as follows: "The duties prescribed by this Act may be enforced by mandamus, and in the event any bond or interest coupon is not paid when due, the holder thereof, or the trustee in any instrument of pledge executed to secure the same, shall have the right to apply to any chancery court having jurisdiction in any part of the district, for the appointment of a receiver to collect said assessment, and apply the same on said bond or interest coupon, and in the event of the appointment of any such receiver, all suits for collection of delinquent assessments shall be instituted in his name as receiver of the board, and as long as said receivership is in force all assessments collected shall be paid by the collector to said receiver, instead of to the treasurer or depository of the board. Said receivership shall exist until all the past due bonds and interest coupons have been paid in full."

It was under the above provisions that the district executed its first pledge, and the first issue of bonds in the full amount authorized was sold to bona fide purchasers.

In 1915, Special Act No. 80 (page 297) was passed as an amendatory act to those passed in 1911. Section 12 of that act amended the existing section 12 of the prior acts so that it read as follows: "For the purpose of constructing, completing and maintaining the drains, ditches, canals, levees and dams contemplated by this Act, and in order to enable the Board of Directors to further carry out the purposes of this Act, the said board shall have power to borrow money from time to time at the rate of interest not to exceed six per cent per annum, and to that end may issue and sell at not less than par negotiable bonds of said district, to an amount not exceeding $1,000,000.00, payable in lawful money of the United States, at such

time and place, and in such denominations as the board may prescribe. Said bonds so issued by said board shall be signed by the president and countersigned by the clerk, and the seal of the district attached thereto. The board is hereby required to set aside annually from the first revenues collected from any source whatever, a sufficient sum to pay the interest for that year on all outstanding bonds, and any installment of principal that may become due in that year, and for the purpose of securing the payment of said bonds and interest, a lien is hereby charged on all lands, lots, railroad embankments and tramways, in said district, paramount to all other liens except the liens of bonds heretofore issued."

Other sections of the act of 1915 bear directly upon the improvement to be made and clearly show a changed and extended plan of improvement (see section 3). This act contained the same pledge of revenues as section 13 of the 1911 acts, above quoted, and the same method of enforcement as in section 14 of the 1911 acts, above quoted. Under the authority of this act, the district executed its pledge, and the second issue of bonds ($700,000) was put out and sold to bona fide purchasers.

In 1919, Special Act No. 454 (page 581) was passed. It was entitled: "An Act to Enable the Board of Directors of the Cypress Drainage District in Desha and Chicot Counties to Expedite the Construction of and Final Completion of the Work Authorized by Act No. 80 of the Acts of the General Assembly of the State of Arkansas in the Year 1915, and for Other Purposes." No bonds were sold under this act until after it had been amended by the act of 1921.

In 1921, Special Act No. 260 (page 495) was passed, entitled: "An Act in Aid of Cypress Creek Drainage District, in Desha and Chicot Counties." After reciting that the district had exhausted its funds, but had not made any issue of bonds authorized by the act of 1919, the act amended section 2 of the 1919 act to read that: "For the purpose of expediting the construction and final completion of the improvements authorized by Act No. 80 of the Acts of the General Assembly of the State of Arkansas for the year 1915," the district was authorized to issue bonds not exceeding $800,-000 and that:

"Said board may levy upon the assessed benefits in said district such imposts as are necessary to meet said evidences of indebtedness or bonds as the same may mature, and also to meet the interest thereon as same accrues.

"Said board may secure the payment of said bonds or evidences of indebtedness by a pledge or mortgage of its assessment of benefits; and in order to continue the work, it may issue to the contractor, from time to time, its negotiable evidences of debt, which shall be taken up and cancelled when the bonds hereby authorized to be issued are sold, and shall be paid out of the proceeds of said bond issue, which is not to exceed $800,000.-00."

Under the above authorizations of the acts of 1919 and 1921, the district executed the pledges and put out its bonds of the third and fourth issues.

In this situation, the contentions are as follows. Appellants contend (1) that the 1911 acts contemplated and provided for a described improvement upon which but one issue of bonds was authorized and that such acts were complete in themselves without any vision or intention as to future issues of bonds, and that, when such bonds were issued in accordance with those acts, they became a first charge upon the revenues of the district with the rights to enforce collection thereof and to make first application to the payment of such bonds; and (2) that the 1915 act broadened the scope of the improvement and made provision that such enlarged improvement would be taken care of by the issue of the additional amount of $700,000 provided for therein, and that the bonds issued thereunder had rights of priority upon the revenues of the district exceeded by and only by the bonds under the first issue. Also, that to hold that the third and fourth issues of bonds were on a parity with either the first or the second issues would impair the contracts between the bondholders under those earlier issues and the district, and thus be violative of the Constitution.

On the other hand, appellees contend that all four issues are on a parity for the reasons: (1) That justice demands equality; (2) that no priority could have been intended by the Legislature; (3) that, under the laws of Arkansas, all such bonds are on a parity unless there is a distinct declaration to the contrary and no such declaration is here; and (4) that the statutes for the first two issues authorized no pledge of "assessment of benefits, or the tax levy, or the revenues of the District."

In entering the determination of these contentions it is important to consider two decisions of the Supreme Court of Arkansas

involving this very district. These decisions have a direct bearing upon the priority of the first issue and are pertinent upon the succeeding priority of the second issue. Also, they have to do with the first and second of the above contentions of appellees. Cypress Creek Drainage District v. Wolfe, 109 Ark. 60, 158 S. W. 960, was an appeal from a judgment restraining the collection of assessments on lands in the district and involved a construction of the above acts of 1911 and their scope. The chancellor below held that section 3 of these acts contained the plan of drainage for the district to carry out and limited the amount that could be expended therefor, and that the system of drainage prescribed and authorized by the act was not such as the directors of the appellant district had undertaken, their plan being one which estimated the cost of building the main drains at $1,600,000, and of the complete system at $2,000,207, the chancellor saying (109 Ark. 60, at page 65, 158 S. W. 960, 961): "I think it clear from these provisions of this amended act that *the Legislature only contemplated the one main drainage canal*, reaching from the Lincoln county line to Chicot county, as set out in said act; that it intended to limit the board to the issuance of only $300,000; and that it might use any surplus remaining after the completion of this main canal, to the construction of such laterals as it might deem most beneficial. So in this opinion I hold that said board cannot adopt the plan mapped out by the government's engineers under the present act, and thereby radically and materially *change the plan contemplated by this act, and thereby entail a burden of seven times the amount contemplated by the act.*" (Italics ours.)

Regarding the above issue, the Supreme Court of the state said at page 65 of 109 Ark., 158 S. W. 960, 962: *"The chancellor was correct in finding that the third section of the act defines the system of drainage contemplated by the Legislature, and also in finding that the board could not expend more than the sum of $300,000 to carry out the purpose of the Legislature as expressed in the act.* The intent of the Legislature is not left to be gathered from doubtful language in various sections of the act, but it is clearly and unmistakably expressed in the third section, and, where the intent is clearly expressed in unambiguous language, it is the duty of the court to give that language its full force and effect. The court cannot change the plain meaning of the words used

by the Legislature, without trenching upon its functions. Therefore we are of the opinion that no authority can be found in the act for the construction of five main drains or canals, with laterals, at a cost of $2,000,207, when *the language of the act defining the system clearly expresses that there shall be one main drain or canal, with laterals, to cost not more than $300,000.* To do so would be doing violence to the language of the act, and would be, in our opinion, the baldest kind of judicial legislation. The language of the third section plainly shows that the Legislature had in mind only one main drain or canal, and this the Legislature divided into two parts, viz., 'from the Lincoln county line to Boggy bayou,' and 'of Boggy bayou from the government levee to Clay bayou.' It is plain that in the matter of construction the Legislature had in mind these divisions of the main drain into two parts, for it says: 'The work from Boggy bayou on down shall be completed before the government is asked to move its Boggy Bayou Levee.' Then in another portion of this section the language is: 'The board shall provide in like manner for the opening and constructing of a ditch or canal from the Lincoln county line to Boggy bayou.' It is clear that the main ditch or canal was treated as having these two parts, for, after the description of these parts, the language continues: 'After the completion of the main ditches or canals as above set forth, it may construct such general or main laterals, as will be of benefit to the community, etc., out of the funds in its hands, from the surplus and if there be a surplus.' The use of the terms 'main ditches' or 'canals' in the plural shows that the main drainage ditch or canal before described was to be composed of the two parts as above stated; the one part running 'from the Lincoln county line to Boggy bayou,' and the other 'of Boggy bayou from the government levee to Clay bayou,' both together constituting the main drainage canal from its beginning at 'the Lincoln county line' to its terminus at 'Clay bayou.' In other words, the main canal, consisting of these two parts, was to begin at the Lincoln county line and to end at Clay bayou. Wherever the words 'drains,' 'ditches,' and 'canals' are used in other sections of the act, they must be held to have reference to the 'general or main laterals' to the one main drainage canal. These 'general or main laterals' are provided for in the third section of the act and are contemplated as a part of the drainage system by which the water was to be run into and

conducted through the one main drainage canal, as above described. *To our minds it is clear that the Legislature did not intend that the system of drainage provided by the act should cost exceeding the sum of $300,000.* The money to be expended for the work was to be borrowed 'at a rate of interest not exceeding six per cent. per annum,' and 'to that end negotiable bonds of the district were to be issued not exceeding $300,000.' The only purpose of issuing bonds was to borrow money to do the work. That was the only method provided for raising the necessary fund, and, as we construe this provision, it was a limitation upon the power of the board to borrow money in excess of the sum of $300,000. *No greater sum than this was authorized to be expended in the prosecution of the work.* This construction is strengthened by the language also of the third section, providing that after the completion of the main ditches or canals, constituting the one main channel of the drainage system, as above explained, 'general or main laterals' could be constructed from the 'surplus fund,' if there should be a 'surplus.' *In other words, this shows that the sum of $300,000 was named as the sum to be expended, and no more,* and if it did not require this sum to construct the main drainage canal then the residue could be used in the construction of lateral drains. To give the act the construction contended for by appellants, the third and twelfth sections would have to be entirely ignored. The construction we have indicated will harmonize all parts of the act, and at the same time effectuate the legislative intent so clearly expressed and shown in the third and twelfth sections. It is our duty to so construe the act that every clause, sentence, or part shall stand if possible. No section should be rendered nugatory, where it is possible to carry out the purpose of the Legislature without so doing. Wilson v. Biscoe, 11 Ark. 44; Kelly's Heirs v. McGuire, 15 Ark. 555; Scott v. State, 22 Ark. 369; McNair v. Williams, 28 Ark. 203; Little Rock & Fort Smith Rd. Co. v. Howell, 31 Ark. 119; Beavers v. State, 60 Ark. 129, 29 S. W. 144. *The Legislature must be presumed to have had a competent knowledge of the subject-matter of the legislation. It must be presumed to have ascertained in advance the kind of improvement needed by the people affected thereby and the proximate cost of that kind of improvement.* Page & Jones on Assessments, § 290. *Since it has limited the cost of improvement to $300,000, it would be unreasonable to conclude that it had provided at the same time for a drainage system that would cost more than six times the sum fixed as the limit of its cost.* Therefore the chancery court was clearly correct in holding that the assessment based upon the alleged benefits to be derived from a system to be constructed according to the plan adopted by the appellant district was illegal and void." (Italics ours.)

Sain v. Cypress Creek Drainage District, 161 Ark. 529, 257 S. W. 49, 258 S. W. 637, was an action by a landowner for damages caused by flooding a portion of his land by the improvements of this district. This case is important mainly as containing a definition of the decision in the Wolfe Case and showing the views of the Supreme Court as to the scope and purpose of the 1915 Act. That portion of the opinion (on page 532 of 161 Ark., 257 S. W. 49) is as follows: "Plans were formed for the construction of the improvement, and assessments of benefits to the lands in the district were made, but, in litigation which arose between the district and certain landowners before further progress had been made in the affairs of the district, *it was decided that the plans exceeded in scope the authority conferred by the statute creating the district.* Cyress Creek Drainage District v. Wolfe, 109 Ark. 60, 158 S. W. 960. *After that decision was rendered, further legislation was found necessary to give authority for the construction of the improvement which would be adequate to the demands of the situation, so the General Assembly of 1915 enacted a statute* (Acts 1915, p. 297) *amending the original statute creating this district by enlarging the powers with respect to the extent of the improvement to be constructed,* and, among other things, it was provided in that statute (section 5)—'that the assessment of benefits heretofore made by said district, as the same appears upon the assessment books thereof, is just and equitable, and the same is hereby affirmed and declared to be the assessment of benefits of said district.' The improvement was then constructed in accordance with the plans, which contemplated the construction of a large ditch, or canal, beginning in the northern portion of Desha county and running thence southerly about 19 miles to the head of Bayou Macon, thus gathering up the surface waters, and waters which drained through Cypress creek and other streams, and carrying them into the head of Bayou Macon, through which they flowed, as above stated, southward." (Italics ours.)

■ The importance of the above cases is that they amount to a clear declaration by the Supreme Court of the state that the 1911 acts were complete in themselves, and that another and larger improvement was contemplated by the later acts. That declaration is binding upon this court and, also, accords with our view. This crystallizes the situation that, when the first issue of bonds was put out, the bondholders, the district, and the Legislature contemplated that such would complete the improvement provided for and intended. This answers the arguments of appellees that it could not have been intended at that time that there would be no further issues of bonds because it was understood that the $300,000 issue could not complete the improvement provided in the act. While these decisions are determinative of that contention, yet it may be added that such contention is based mainly upon the larger estimated amount ($1,600,000) contained in the plan adopted by the district, and the large amount of benefits ($5,552,-491.75) assessed. But that plan was not devised until some time *after* the act had been passed and was held, in the above Wolfe decision, not to be the plan contemplated by the act. Also, the benefits were not known or assessed until some time *after* the plan was adopted. So there is no basis whatever for construing the acts of 1911 in the light of what later developed as to cost of an unauthorized larger plan or as to benefits.

■ As to the contention of appellees that justice demands equality, it may be said that the purchasers of the first bond issue had a right to believe that their bonds would be the only issue made for this improvement, and to permit the Legislature thereafter to change the plan, and to authorize five times as many more bonds to be issued to share with them, would constitute a legal fraud upon them.

Also, it would be a clear impairment of their contract with the district. Under the legislative authority of these acts of 1911 the district made its contract (the pledge and bonds) with the bondholders and their representative, the trustee. That contract became effective, and right vested thereunder. Thereafter, the Legislature has no power to alter such contract rights to the detriment of those who dealt with the district upon the faith of the authority granted by the Legislature to the district. The matter is well expressed in a quotation from Droit de la Nat. L. 1, c. 6, § 6, contained in City of Cincinnati v. Seasongood, 46 Ohio St. 296, 21 N. E. 630, at page 633, as follows: "A law can be repealed by the law-giver; but the rights which have been acquired under it while it was in force do not thereby cease. It would be an act of absolute injustice to abolish with a law all the effects which it had produced." The same is as true of an amendment as of a repeal. To prevent just such character of injustices was one of the reasons that the Constitution (article 1, § 10, cl. 1) denied to the states the power of impairing the obligations of legal contracts. Scotland County Court v. U. S., 140 U. S. 41, 11 S. Ct. 697, 35 L. Ed. 351; Seibert v. Lewis, 122 U. S. 284, 294, 7 S. Ct. 1190, 30 L. Ed. 1161; Port of Mobile v. Watson, 116 U. S. 289, 305, 6 S. Ct. 398, 29 L. Ed. 620; Louisiana v. Pilsbury, 105 U. S. 278, 26 L. Ed. 1090; Moore v. Otis, 275 F. 747, this court; Town of Samson v. Perry, 17 F.(2d) 1 (C. C. A. 5); Padgett v. Post, 106 F. 600 (C. C. A. 4); Brodie v. McCabe, 33 Ark. 690. Also, it may be said that it is no unusual thing for governments, governmental agencies, and private parties to undertake constructions which will far exceed their first plans or ideas; to borrow money on the security of the contemplated improvement, and later to find that it requires much more money to complete the improvement. In such a situation, it has never been thought that the security already given could be affected or shared by money later borrowed upon the same property merely because the expenditure of the later money redounded to the benefit of the security held for the first loan. This operation is constantly taking place and takes the form of a second or subsequent mortgages.

The above decisions and the situation effectually dispose—as to the first issue of bonds—of the two contentions of appellees that justice demands equality, and that no priority could have been intended by the Legislature when it passed the acts of 1911.

Under the discussion above, it is clear that the first issue of bonds stands superior to all subsequent issues upon the theory announced in the Wolfe Case, that the 1911 acts contemplated a complete improvement, and it would be a legal fraud upon the purchasers of the bonds under those acts to permit a later issue to share on a parity to them and, also, upon the ground that it would be impairing the terms of their contract entered into in pursuance to the powers given the district under those acts, and therefore violative of the Constitution. Trustees of Wabash & Erie Canal Co. v. Beers, 67 U. S. (2 Black) 448, 17 L. Ed. 327.

438

As to these two contentions (equity and intention of the Legislature) of appellees, the priority of the second issue over the later issues should be declared for similar reasons. There is no intimation in the 1915 act that more money would be required to complete the work there contemplated than was provided for in that act. There is not the slightest intimation therein which would warn purchasers of bonds issued under that act that there might be subsequent issues of bonds which would share on a parity with them. It is obvious that, if such had been the case, those bonds would, not only have been seriously affected in price, but probably would have been unsalable because there would have been no way for the purchasers to know the amount of subsequent bonds which might be thus authorized and issued and which would be upon a parity with the bonds offered under the 1915 act. Very few purchasers could be found for securities clothed with such uncertainties.

Another contention of appellees is that, under the Arkansas laws, all bonds issued by an improvement district are on a parity unless there is a distinct declaration to the contrary, and they say that no such declaration is here found in these statutes. They rely upon four cases, two in the Supreme Court of Arkansas and two in this court. None of those cases are applicable here. Three of them (Hoehler v. W. B. Worthen Co., 154 Ark. 444, 243 S. W. 822; McNear v. Little Red River Levee Dist. [C. C. A.] 293 F. 717, and State Bank of Wellston, Mo., v. Mississippi Valley Trust Co. [C. C. A.] 297 F. 563) deal with successive issues under the same authorizing statute. That situation is essentially different from this because there the act iself declares and prospective purchasers of earlier partial issues know therefrom that further bonds may issue, while here each issue is authorized under a separate and successive act with no intimation therein that there may be further issues or that further issues will be given a parity with bonds then being offered. The fourth case (Board of Commissioners v. Board of Directors, 181 Ark. 898, 28 S.W.(2d) 721) is a case of overlapping districts, one being a drainage, and the other a levee district, the drainage district covering about two-thirds of the land included in the levee district. That case presented only a question of construction of a section of the general statutes of Arkansas in no wise here involved. In that opinion, however, the court stated that, unless there is a clear declaration to the contrary, the lien of improvement district bonds is not superior to the state general taxation, nor is it destroyed by a sale for general taxes, nor is there a destruction of a lien under one district by sale of lands to satisfy the lien of another district. The nearest approach to the circumstances of this case which that decision makes is that, where there are overlapping and separate districts, the liens of each are preserved, and neither is destroyed by the other under a theory of priority unless such priority be clearly and definitely stated by the Legislature. That pronouncement is merely an application of the rule announced in some jurisdictions to the effect that the tax liens of different governmental units will be treated as upon a parity when they affect the same property unless the Legislature has expressed a different intention. Kentucky Lands Inv. Co. v. Fitch, 144 Ky. 273, 137 S. W. 1040, 1042, Ann. Cas. 1913A, 672, citing Justice v. City of Logansport, 101 Ind. 326; Dennison v. Keokuk, 45 Iowa, 266, and Bellocq v. New Orleans, 31 La. Ann. 471; Brownell Improvement Co. v. Nixon, 48 Ind. App. 195, 92 N. E. 693, 95 N. E. 585. Such situation is different from this, where the contest is between bondholders of the same district and under issues authorized by different and successive statutes with no intimation therein of issues beyond those set forth therein. Both the theory, principle, and effects are different.

Since these cited cases do not rule this contention of appellees because they are not applicable, we pass to the examination of the contention itself. While there is a rule that the lien of the latest tax prevails over earlier liens of similar taxes levied by the same authority, that rule is applicable only to general taxes for the support of the governmental unit (state, city, county, etc.) levying the taxes. It is not applicable to special taxes for improvements based upon benefits to property, but such liens take precedence in chronological order. Parker-Washington Co. v. Corcoran, 150 Mo. App. 188, 129 S. W. 1031; Des Moines Brick Mfg. Co. v. Smith, 108 Iowa, 307, 79 N. W. 77; Brady v. Burke, 90 Cal. 1, 27 P. 52; Wood v. Brady, 68 Cal. 78, 5 P. 623, 8 P. 599. This difference between the rules of priority of liens as to general taxes and as to special taxes is based upon the difference in character of the taxes themselves. Ill. Cent. R. Co. v. Decatur, 147 U. S. 190, 13 S. Ct. 293, 37 L. Ed. 132; Parker-Washington Co. v. Corcoran, 150 Mo. App. 188, 129 S. W. 1031. Of course, the Legislature may declare such priorities as to

special or general taxes as it may see fit so long as such declaration does not affect vested rights to the extent of legally impairing such rights. However, there must be a clear statement of such priority to disturb or overthrow the ordinary priority based on time. Parker-Washington Co. v. Corcoran, 150 Mo. App. 188, 129 S. W. 1031; Des Moines Brick Mfg. Co. v. Smith, 108 Iowa, 307, 79 N. W. 77; also see Finn v. Haynes, 37 Mich. 63; Lydecker v. Palisade Land Co., 33 N. J. Eq. 415; Yeatman v. Foster County, 2 N. D. 421, 51 N. W. 721, 33 Am. St. Rep. 797; Strand v. Marin, 30 N. D. 165, 152 N. W. 280; Cadmus v. Jackson, 52 Pa. 295; Pittsburgh's Appeal, 40 Pa. 455, holding that priority of tax lien over an earlier mortgage must be clearly expressed. We approve this generally accepted rule that; where special improvement taxes are authorized by the same governmental unit for the same character of improvement under different authorizations, the liens of such taxes (where they are made liens) take precedence in the order of time unless the contrary is clearly expressed. Where bonds of the same district are issued under successive acts of the Legislature, and where there is no expression in the earlier acts from which it can be fairly inferred that the Legislature contemplates future issues and contemplates that such future issues shall be upon a parity with earlier issues, such subsequent issues are not upon a parity.

Our next inquiry is whether these acts of 1919 and 1921 express any priority or parity of lien with the bonds authorized under the acts of 1911 and of 1915. Each of these acts (1919 and 1921) contains a recognition of the issues of bonds under prior acts. The language used in this regard is that the bonds issued under the particular act shall be a lien charge "paramount to all other liens except the liens of bonds heretofore issued." Appellants contend that this language shows a recognition of the priority of earlier bonds, while appellees contend that this provision was inserted only to avoid the operation of a rule of law that the last tax lien is superior. As stated above, the rule of law that the latest tax lien is superior is not applicable to benefit assessment tax liens; therefore this language was not used for the purpose of avoiding priority of a later tax lien. This language recognizes the existence of the prior issues and that the bonds under the act are not paramount to such prior issues, but it does not mean that the bonds issued under the particular act are on a parity with prior issues. The purpose and effect of this language is to make the bonds issued thereunder superior to existing private liens—such as mortgages.

The last contention of appellees is that the first two acts authorized no pledge of the benefits of the tax levy or the revenues of the district. This contention is answered by the provisions in sections 12 and 13 of the 1911 acts, where it is said: "For the purpose of securing the payment of said bonds and interest, a lien is hereby charged on all lands, lots, railroad embankments and tramways in said district, paramount to all other liens except other taxes" (section 12), and "for the prompt payment of bonds and coupons the entire revenues of the district arising from any and all sources are pledged, and for the purpose of paying said bonds and coupons, said board may execute an instrument of pledge in due form of law" (section 13). This view is further fortified by the provisions of section 14 permitting appointment of a receiver to collect the assessments to pay the bonds. The act of 1915, under which the second issue was made, contains the same language.

We think the court erred in its view of the law as to the construction of these acts. It made a corollary error in its findings of fact challenged on these appeals. Those findings of fact were based upon the view of the court that it could not be presumed that the Legislature was ignorant of the size of the improvement contemplated, of the fact that the improvement would cost much more than the amount authorized in the 1911 acts, and of the fact that it would produce benefits of more than $5,000,000. The presumptions made by the court as the basis for its findings are not justified by the evidence in the record and are directly prevented by the decision in the Wolfe Case.

The decree should be, and is, reversed, with directions to enter a decree sustaining the priority of the first and then the second issues in that order.