Mr. Justice MILLER.
 

 This is an appeal from a decree of the Circuit Court'of the United States for the District of Indiana.
 

 The Government of the United States having granted to the State of Indiana certain lands to aid in the construction of a canal, designed to unite the waters of Lake Erie with those of
 
 *449
 
 the Wabash river, that State caused the route to be surveyed and located, and an estimate to be made of the cost of construction, which was calculated at the sum of $1,081,970.
 

 On the'7th day of January, 1832, an act was passed, which approved and adopted this survey and estimate, established a Board of Canal Commissioners, and authorized them to borrow the sum of $200,000, to be used in making said canal. The fifth section of this act is as follows:
 
 “
 
 That for the payment of the interest, and redemption of the principal of the sums of money which may be borrowed under the authority of the General Assembly, for the construction of said canal, to the extent of the estimated cost thereof, in the first section of this act stated, there shall be and are hereby irrevocably pledged and appropriated, all the moneys in any manner arising from the lands, donated by the United States to this State, for the construction of said section of said canal, the canal itself, with the said portion of land thereto appertaining, or as much thereof as will realize by sale the sum borrowed, and all privileges thereby created, and the rents and profits thereof belonging to the State, arid the net proceeds of tolls collected on said canal, or any part thereof, as finished; the sufficiency of which for the purposes aforesaid, as above allowed and provided for, the State of Indiana doth hereby irrevocably guarantee.”
 

 Under this act there were issued two hundred bonds for one thousand dollars each, two of which are held by complainant in this suit; and the decree which was rendered in his favor, was for the interest due and unpaid on them.
 

 In 1834, the Legislature authorized another loan of $400,000,-for the benefit of the canal, for which the act again pledged the canal and the lands granted by the Federal Government, and the State guaranteed the sufficiency of the security;
 

 In 1835, by another act, the Legislature contracted a third loan of $227,000, for the benefit of the canal. But for this it did not .pledge the canal, but only the faith of the State.
 

 In 1836. a law was passed providing for a general system of internal improvement, which authorized the State to borrow ten millions of dollars, for which sum, in gross, she pledged her
 
 *450
 
 canals, railroads, turnpikes, and the tolls and water rents arising from them; and by the tenth section of that Act an additional loan of $500,000 was authorized for the benefit of the canal, for which the canal, its lands and resources, were again pledged as security.
 

 Of some one of these later loans, probably the ten million loan, as they are called internal improvement bonds, the plaintiff became the owner of thirteen bonds, of $1,000 each.
 

 Under the pressure of the large debt contracted by this last act, and of the general financial distress which followed shortly after it was created, the State found herself unable to pay the interest on her bonds, her credit seriously impaired, and her citizens weighed' down with heavy taxation. In this state of her affairs, she came forward in 1846 with a propostion to her creditors, which is to be found embodied in the Act of January 19th, 1846, and the Supplementary Act of January 27th, 1847.
 

 The principal features of these acts, so far as they concern our present purpose, are, that the bonded debt of the State, except its _ bank stock bonds, should be equally divided between the State and the Wabash and Erie Canal; that the bonds then out should be surrendered, and in place of them the holders should receive one-half in State stock certificates, bearing five per cent, interest; and for the other half, Wabash and Erie Canal stock certificates, bearing the like rate of interest. ■ For the security of the payment of the latter, the act provided that' the entire canal, its lands, revenues, and property of every description, should be conveyed to trustees, whose powers and duties were therein prescribed. As a means of completing the canal and rendering it productive, the parties who surrendered their bonds and received stock certificates in lieu thereof, were required to pay ten per cent, on the amount of the new certificates for that purpose. ■ For this the Act also gave them a lien on the canal and its revenues in the hands of the trustees. These statutes were not to take effect until $4,000,000, which was about half of the bonds of the State, were surrendered; and the canal was not to be transferred to -.the trustees until $800,000 had been subscribed by holders of certificates for its completion. The
 
 *451
 
 creditors of the State generally accepted this arrangement. The necessary amount of bonds was surrendered to give effect to the act, and the necessary sum was subscribed to authorize the transfer of the canal to the trustees. The plaintiff surrendered his thirteen bonds of the issue of the Act of 1836, and paid his subscription of ten per cent., but he did
 
 not
 
 surrender his two bonds issued under the Act of 1832, nor does it appear that any bonds of that issue were surrendered.
 

 It is claimed by counsel for appellant, that $881,970 of bonds of the
 
 same class
 
 of the two retained by plaintiff were surrendered. This is founded on the idea, that of the bonds issued under the Acts of 1834, 1835, and the 10th section of the Act of 1836, so many are to be considered as entitled to the security provided by the Act of 1832 as will make up with the $200,000 first issued, the estimated cost of the work mentioned in the latter act. It is difficult to see how this can be maintained, if it be in any way material to the determination of the case. The bonds which were issued under these acts seem very clearly to depend on the respective acts under which they were issued, for any lien they may have had, on the canal, its lands and revenues, and not on the Act of 1832; and the Act of 1835 gave no lien at all on the canal or anything appertaining to it, but in place thereof pledged the faith of the State for the payment of the debt and interest. The purchasers of these bonds understood it so no doubt, for it appears from the record, that while all of the bonds issued under acts subsequent to 1832 were delivered up, and stock certificates received for them, none of the $200,000 of that issue was so surrendered. But one reason can be imagined for this, namely, that the security for those first issued was sufficient, and the holders of them did not believe they could improve their condition by an exchange for stock certificates, while the holders of the latter--bonds believed that with the $200,000 lien prior to theirs, they
 
 would
 
 improve their condition by taking the State for one-half the debt and the canal stock certificates for the other half. We think their conclusions were sound, and that these several loans were liens of which the
 
 *452
 
 first was paramount, and the others entitled to preference in the order of their date.
 

 If then these bonds were a lien on the canal, its lands and revenues, paramount to all others, the Legislature of Indiana, (whatever it may have designed to do,) could not divest that lien or postpone it to others, because it was the result of contract, and was protected by the provision of the Constitution of the United States against impairing the obligation of contracts. This is not controverted, but it is said that plaintiff, by his own act, has' done that which the Legislature could not do; in delivering up his thirteen bonds, which were either no lien or at most a secondary one, and receiving the canal stock certificates for half of- them and State stock certificates for the other half, and by payment of the ten per cent, on them required by the law. This idea is strongly urged by counsel for appellant. It is the only ground going to the merits on which plaintiff’s right to a decree is resisted, and we have given it our full consideration. It presents itself in two aspects, each of which is entitled to a separate examination. It is said first, that by the acts above mentioned,-the plaintiff established a relation between himself and other parties who had made a like surrender of bonds ■ and a like advance of money, which makes it an act of bad faith in him to assert in this suit, his right to priority of payment for these bonds, when the result will probably be to deprive those who took the canal certificates of all hope of payment, either for the certificates, or for the, money advanced to' complete the canal.
 

 If the parties had stood in all respects in the same attitude towards the fund, which was their common security at the time of these transactions, and the plaintiff were now seeking to appropriate that fund to the payment of his debt exclusively, there would be great force in the argument. But such was not the case.
 

 The plaintiff held a double relation to that fund. He had, in common with certain persons, a debt, which was a first and paramount lien on it, and he had, in common with certain other persons, a debt which was no lien, or if a lien, only
 
 *453
 
 secondary, and of little value. In common with all those who 'held the prior lien, he refused to surrender it. In common with those who held the other debts he surrendered his, and united-with them in such arrangements as were supposed to be for their mutual benefit. There was no concealment of his interest in the debt which had the prior lien, nor of the existence of that lien. The number and character of the bonds which were liens on the canal were matters of public record, accessible to every body, and all prudent men must have acted in these matters in reference to their existence. It could make no difference to the parties who took the certificates of stock for these bonds, in whose hands the prior lien was found. Its amount and its validity were the same, whether in the hands of one who had surrendered other bonds, or of those who had surrendered nothing. We do not attach any importance to the idea that other persons may have been influenced by his example to surrender their bonds, so long as there is no evidence that he used undue persuasion, or made improper representations.
 

 If we were at liberty to inquire into the motives which induced parties to surrender their bonds, and pay their ten per cent., they would- probably be found quite consistent with a recognition of plaintiff’s right under his prior bonds. The security which they had was manifestly of' little value. The canal was incomplete. It paid no interest, and as matters then stood would probably never pay any of the interest or principal By surrendering these bonds they received State stock for half the amount, for which the State pledged her integrity to provide by taxation, payment of both interest and principal. By advancing $800,000 it was believed that the canal would be completed, and rendered productive property, and if so, it was expected to pay off all the bonds of the issue of 1832, and then remain ample security for the $800,000 advanced, and for principal and interest of the canal stock certificates. These calculations seemed likely to be justified by the result, until the wonderful multiplication of railroads ruined the canal by competition It was a common effort on the part of those who had the inferior class of bonda to make a security which was not
 
 *454
 
 satisfactory, yield as much as possible; and the fact that one of those had a paramount security on the same fund known to the parties, cannot certainly be called an act of bad faith in him, since he risked his last investment as they did; nor can we perceive that the failure of the scheme, by events not foreseen by any one, should deprive him now of the rights which he then resérved.
 

 But, in the second place, it is maintained that the effect of the Acts of 1846, and 1847, when so far complied with as was necesnessary'to put them in force, was to destroy all liens' on.the canal which were not protected by them, and that no protection was,' afforded in any case, unless the bonds were surrendered and the new security taken. And while it is conceded that if plaintiff had remained entirely aloof, the act could not have had that effect as to him, it is insisted that his surrender of thirteen bonds, and acceptance of the stock certificate for them, must be held to imply his assent to all the provisions of these acts, including those which destroy his priority of lien for his two bonds of 1832.
 

 If any such implication arises from the transaction, it must be one of law, and not of fact; for it would be absurd to suppose that while he consented to the destruction of his security for those two bonds, he failed to surrender them, and get the faith of ' the State for one-half, and a lien on the canal for the other. Such a presumption must be one of those necessary legal presumptions which the law will not allow to be disproved by any evidence whatever.
 

 So far as he surrendered bonds and received certificate of stock for them, it is beyond doubt that he accepted all the provisions which related to those bonds; but any presumption that he consented to waive other rights, must be based on the ground that the acceptance of those- certificates was incompatible with the assertion of his rights in reference to the bonds which he did not surrender. Those statutes did not require that all persons who held bonds should surrender them, nor that all who did so should surrender all they had. They provided that those who
 
 chose
 
 to do so might deliver up their bonds and accept
 
 *455
 
 the certificates of- stock, but nothing was obligatory on the State or the creditors until $4,000,000 of bonds were surrendered. When that event occurred, the arrangement was binding. But to what extent? We can see no reason for saying it was binding beyond the extent of the bond so ex changed, as between the State and the párties to the transaction. In regard to the State, as to his associates in the matter of the subscriptions, the plaintiff held a two-fold relation; and the fact that he agreed to accept for his thirteen bonds a certain compromise, can scarcely be said to afford an implication, incapable of refutation, that he -abandoned his claim under the two other bonds. Nor do we perceive that his surrender of thirteen bonds, and payment of $1,300 toward the completion of the canal, was inconsistent with his retaining and insisting on his lien for the other two bonds of a different class.
 

 It is unnecessary, however, to pursue this branch of the inquiry further, because we are satisfied that neither the Act of 1846, nor the supplementary Act of 1847, were in anywise intended to destroy the priority of lien which belonged to the Wabash and Erie Canal bonds, so called. This phrase is applied in the Act of 1847, to the bonds issued under the Acts of 1832, 1834, 1835, and the $500,000 issued under the 10th section of the Act of 1836. In all of those Acts, except that of 1835, the canal was pledged as security for the bonds, and the State guaranteed the sufficiency of the security. In section eight of the Act of 1846, in which the power is given to the Governor to convey the canal to the trustees, and which also goes on to provide in five distinct sub-sections, for the order of payment out of the canal fund, there is this very clear and explicit de ■ claration: After describing the manner of conveyance, and whait is to be conveyed, including the canal and all its resources, these words are added: "Subject, nevertheless, to all existing rights and equities against the State on account of the same, or any part thereof, or liabilities of the State growing out of or in rela-. tion thereto.”
 

 In the supplemental Act of 1847, section 10, the order of distribution of the funds arising from the canal resources is some
 
 *456
 
 what changed, but after the ninth and last paragraph on that subject there is this language:
 

 “And it is hereby declared, that such sums shall from time to time be paid and applied as soon as conveniently may be after the receipt thereof,
 
 saving the just rights of the holders of bonds now outstanding, known as the Wabash and Erie Canal bonds ai'provided in the eighth section of this Act."
 

 We cannot resist.the conviction that these provisions were intended to preserve the lien which the bond-holders of this class had, notwithstanding the transfer of the canal to other Hands, for other purposes. The bonds for which the State had guaranteed that the canal, was a sufficient security, certainly constituted an “existing right and equity against the State,” on account of the canal, and a “liability of the State growing out of it.” And no where more appropriately than in an Act transferring the canal to other hands, for other purposes, could the • State recognize distinctly the lien which it had created, and the sufficiency of which it had guaranteed. What were the just rights of holders of bonds outstanding and known as the Wabash and Erie Canal bonds in January, 1847? Certainly, speaking in reference to the canal fund, of which that Act wa's making a disposition, their right was to have it appropriated to the payment of the accruing interest on these bonds, and the bonds themselves when due, according to their priority of lien. A very Ingenious argument is made by the learned counsel for the appellant, to show that these provisions were not intended to apply-to this lien, and we are referred to the case of
 
 the
 
 State vs
 
 Board of Trustees,
 
 (4 Ind. R., 495), to support that view. But that case, as we understand it, decides nothing more, than that the holder of one of these bouds who had surrendered it for a .canal'stock certificate, had a right'to have his interest paid out of the funds arising from that part of the canal east of Tippecanoe river, before it was appropriated to the completion of the canal . to Evansville, under the provision of the Act of 1846.
 

 Our construction of these acts is supported by the facts that the.State could not destroy the lien if it had designed to do so, • that -it was reasonable and just that she should protect a lien
 
 *457
 
 the sufficiency of wbicb sbe had guaranteed, and tbat tbe plain and natural import of tbe language used, justifies this interpretation of tbe legislative, intent.
 

 "We are, therefore, of opinion, tbat tbe bonds on which plain- : tiff brought bis suit, were a paramount lion on tbe canal, its lands and revenues, from tbe mouth of Tippecanoe river to tbe ’ east line of tbe State, and tbat said lien has not been impaired ' by any Act of bis, or of tbe State, and tbat tbe decree in his , favor was right on tbe merits.
 

 It is made a point in tbe case, tbat the bill should be dismissed ■. for want of proper parties.
 

 Tbe plaintiff brings his suit' in behalf of himself,
 
 and all others interested in the same issue of bonds.
 
 As we have already said, there seems to be no other bonds, wbicb are liens, outstanding, but those of tbe issue of 1832, all tbe holders of wbicb are made-plaintiffs.
 

 Tbe various creditors of the fund, who have become, so since tbe transfer of tbe canal property to the trustees, and tbe holders, of tbe canal stock certificates, whose interest remains unpaid, are fairly and fully represented by those trustees. They come within that class of persons w bo have an interest in the object of tbe . litigation, but need not be made parties because they are so represented. See Story Eq. Pl., section 141, 142, 143. Mitford’s Eq. Pl., 174. Calvert on Parties to Suits in Equity, top page 17, side page 25.
 
 Van Vechten
 
 vs.
 
 Terry,
 
 (3 John. Chy. R., 197).
 

 - But plaintiff has brought bis suit in behalf of himself and other bond-holders of tbe same class. Tbe record affords strong reason to believe tbat tbe other one hundred and ninety-eight bonds of tbe same issue, are outstanding, with arrears of interest unpaid to tbe same extent as plaintiffs, yet tbe decree makes no provision for them. Tbis we think is error.
 

 Tbe bill in tbis case must be treated as in tbe nature of a creditor’s bill, although not strictly of tbat class. Tbe decree should declare tbe equality of. lien of all these bond-holders with plaintiff; and. should provide for them tbe same relief which it gives to him. And tbe case should be referred to a master to
 
 *458
 
 ascertain who these bond-holders are, about which we presume there will be little difficulty, and to notify'them to come in and share in the fruits of the decree, on paying their proportion of its expense.'
 

 For this' purpose the case is remanded to the Circuit Court, with instructions to proceed in accordance with this opinion.