**SECURITY BANK & TRUST CO. et al. v. BARNETT et al.**

No. 24551.   Sept. 11, 1934.

Rehearing Denied Oct. 23, 1934.

M. M. Thomas and Ames, Cochran, Ames & Monnet, for plaintiffs in error.

M. B. Cope, Snyder, Owen & Lybrand, W. H. Hills, Jos. I. Pitchford, and Malcolm W. McKenzie, for defendants in error.

OSBORN, J. This action was instituted in the district court of Oklahoma county by the Attorney General at the direction of the Governor, and was in the nature of an application for a writ of mandamus to compel the Bank Commissioner and the Banking Board to wind up and liquidate the Depositors' Guaranty Fund. The Attorney General alleged that he was bringing suit for the benefit of the Security Bank & Trust Company of Miami, Okla., and for the benefit of all others holding claims against the Depositors' Guaranty Fund of the state of Oklahoma.

It is alleged that there was in said fund $214,057.70 in cash and $149,621.90 in Liberty Bonds and other securities, and that there are outstanding and unpaid $1,200,000 of Depositors' Guaranty Fund warrants. It is also shown that there was available to said fund $1,500,000, consisting of promissory notes and other frozen assets received from various failed banks, which are of doubtful value.

A number of suits pending in the district court of Oklahoma county by various parties asserting claims against the Guaranty Fund are consolidated with this action, and the Bank Commissioner was appointed receiver to administer, wind up, and completely liquidate the Depositors' Guaranty Fund.

On March 25, 1930, the court directed that all claims of every kind and character be presented to the receiver on or before June 14, 1930. Pursuant to said notice more than 500 claimants intervened and filed their claims against said fund. The claims presented fell into one of the following named four classes:

First. Holders of the numerically first outstanding and unpaid Depositors' Guaranty Fund warrants who asserted that they had a first and prior lien upon the Depositors' Guaranty Fund, and that the funds on hand in the Depositors' Guaranty Fund should be applied in retiring the outstanding warrants in their numerical order.

Second. Holders of outstanding unpaid Depositors' Guaranty Fund warrants who contend that because of the alleged insolvency of the Depositors' Guaranty Fund and the repeal of the Guaranty Fund Law, the funds on hand should be applied to the payment of all outstanding Depositors' Guaranty Fund warrants on a pro rata basis.

Third. Banks which sought the recovery of certain Liberty Bonds, state bonds, and other securities theretofore pledged by them with the State Banking Board to secure and guarantee the payment of lawful assessments made against them, which securities had never been converted into cash, but were held intact by the Banking Board.

Fourth. Those who asserted claims against the Depositors' Guaranty Fund, which claims were neither based upon nor evidenced by outstanding Depositors' Guaranty Fund warrants. Those claimants also contended that they should be paid on a pro rata basis along with the warrant holders.

The court referred the matter to a referee, Hon. John B. Harrison, who made extensive findings of fact and conclusions of law, all exceptions being overruled thereto, and judgment being entered in conformity with the recommendations of the referee.

Included in the judgment of the district court was an order to return all securities held by the Bank Commissioner and the Banking Board for the purpose of securing payment of the assessments due the Depositors' Guaranty Fund, to the parties named in the judgment as being entitled thereto, same being subsequently modified, but no question is raised herein concerning that portion of the judgment, and we shall not notice the same further.

The court's judgment was further to the effect that the numerically first outstanding and unpaid Depositors' Guaranty Fund warrants did not constitute a first and prior lien upon the fund and its assets; that the outstanding and unpaid warrants should not be paid in their numerical order, and that claims were on a parity with warrants and all claims which had been presented to and allowed by the court should share in a pro rata distribution of the Depositors' Guaranty Fund. It was further adjudged that no interest should be paid on the warrants or any other claims.

The plaintiffs in error herein are the owners of the numerically first outstanding and unpaid Depositors' Guaranty Fund warrants. The propositions upon which they

rely to reverse the judgment of the trial court are as follows:

"First. The trial court committed reversible error in ordering and adjudging the payment of outstanding unpaid Guaranty Fund warrants and claims on a pro rata basis and in denying and refusing the prayer of these plaintiffs in error that the outstanding and unpaid Guaranty Fund warrants be retired in their numerical order.

"Second. The trial court committed reversible error in ordering and adjudging that plaintiffs in error were not entitled to receive interest upon their Depositors' Guaranty Fund warrants.

"Third. The trial court committed reversible error in ordering and adjudging that claims not based upon or evidenced by Depositors' Guaranty Fund warrants were entitled to share in the Depositors' Guaranty Fund on a parity with valid outstanding and unpaid Guaranty Fund warrants."

The Bank Commissioner, defendant in error, contends that, since the Bank Guaranty Law was repealed by section 10, chapter 137, Session Laws 1923, the various statutes cited and relied upon whereby plaintiffs in error seek to establish their priority to the funds now on hand are not now effective; that the fund being insolvent, the distribution made by the district court, as a trust fund in equity, is equitable and just and should be sustained.

For the sake of convenience, hereinafter the plaintiffs in error will be referred to as plaintiffs and the defendants in error as defendants.

The principal question involved herein is whether or not the Depositors' Guaranty Fund warrants held by plaintiffs, being numerically first outstanding, together with interest thereon, are entitled to be paid in full. There is a substantial difference, as we shall hereinafter notice, in the nature of the respective obligations involved herein. The warrants held by plaintiffs were issued under and by virtue of the provisions of a portion of section 4162, C. O. S. 1921 (section 6, chapter 22, S. L. 1913), which provides in part as follows:

"(e) If at any time the Depositors' Guaranty Fund on hand shall be insufficient to pay the depositors of failed banks, or other indebtedness properly chargeable against the same, the Banking Board shall have authority to issue certificates of indebtedness to be known as Depositors' Guaranty Fund warrants of the state of Oklahoma, in order to liquidate the deposits of failed banks or any other indebtedness properly chargeable against the Depositors' Guaranty Fund.

"(f) Depositors' Guaranty Fund warrants of the state of Oklahoma shall bear 6% interest from date of issue, payable annually, and shall be issued in such form as may be prescribed by the Banking Board, and shall constitute a charge and first lien upon the Depositors' Guaranty Fund when collected, as well as a first lien against the capital stock, surplus, and undivided profits of each and every bank operating under the banking laws of the state of Oklahoma, to the extent of liability of any such bank to the Depositors' Guaranty Fund under the provisions of this act, and said Banking Board shall have authority to negotiate or otherwise dispose of such Depositors' Guaranty Fund warrants at not less than par value in such manner as it may see fit to facilitate the liquidation of failed banks.

"(g) All warrants heretofore issued by the Banking Board shall be paid serially in the order of their issuance from any funds on hand when this act takes effect, or provided for by the terms of this act, and all warrants hereafter issued shall be in numerical order and retired in like order. As rapidly as the assets of the failed banks are liquidated and realized upon by the Bank Commissioner, the proceeds thereof, after deducting the expense of liquidation, shall be paid to the State Banking Board, and by said board credited to the Depositors' Guaranty Fund. Quarterly, and on the dates provided for financial statements in this act, or oftener if deemed advisable, the Banking Board shall call for payment of all such outstanding warrants, if any, as can be liquidated from the available funds on hand. No corporation doing a trust business shall be liable for assessments to create or maintain the Depositors' Guaranty Fund, nor participate in the protection thereof in any manner whatsoever."

In order to determine the meaning of the above provision, let us briefly allude to the various enactments relating to the guaranty of bank deposits in this state, and to the methods of operation outlined by the various provisions. The original enactment relating to said subject was passed by the First Legislature, chapter 6, art. 2, S. L. 1907-08, and the system outlined provided for certain assessments against the various state banks complying therewith on the basis of the amount of capital stock. By the provisions of section 6, art. 2, S. L. 1907-08, p. 141 (sec. 4160, C. O. S. 1921), it is provided:

"In the event that the Bank Commissioner shall take possession of any bank or trust company which is subject to the provisions of this chapter, the depositors of said bank or trust company shall be paid in full, and when the cash available or that can me made immediately available of said bank or trust company is not sufficient to discharge its obligation to depositors, the

said Banking Board shall draw from the Depositors' Guaranty Fund and from additional assessments, if required, as provided in section 300, the amount necessary to make up the deficiency; and the state shall have, for the benefit of the Depositors' Guaranty Fund, a first lien upon the assets of said bank or trust company, and all liabilities against the stockholders, officers and directors of said bank or trust company and against all other persons, corporations or firms. Such liabilities may be enforced by the state for the benefit of the Depositors' Guaranty Fund."

It was not within the contemplation of the Legislature, as manifested by said act, that the drain on the Depositors' Guaranty Fund should be so great as to fully and completely exhaust said fund in carrying out the primary object of said legislation, to wit, the payment of the depositors in full in cash immediately after the closing of a bank which had complied with the provisions of said law. Practical experience showed, however, that the fund was soon exhausted and that additional emergency assessments were required to be made in order to maintain said fund, and in some instances the depositors of said banks that had failed were required to wait a considerable length of time by reason of lack of funds with which to pay them. The Legislature of 1909 (sec. 3, art. 2, ch. 5, S. L. 1909), and the Legislature of 1911 (sec. 3, ch. 31, S. L. 1910-11) undertook to make proper provisions for said situation. By said legislation they provided that when the cash on hand was insufficient to make full payment to the depositors in a failed institution, "certificates of indebtedness" should be issued against the Depositors' Guaranty Fund which would be paid in like manner as state warrants were paid, that is, in the order of their issuance, out of the Guaranty Fund augmented by the emergency levies provided for in said acts. It was also provided that when the assets of failed banks were liquidated and realized upon by the Bank Commissioner, the same should be first applied to the payment of the expenses of liquidation, then to payment of the Depositors' Guaranty Fund of all money paid out of said fund to the depositors of said failed banks, then to the refunding of said emergency assessments provided for by the above acts made necessary by the unusual drain on said fund. It is to be noted that the "certificates of indebtedness" above mentioned could be issued only in liquidation of expenses or a valid claim against the Depositors' Guaranty Fund accruing by reason of the failure

of a bank which had complied with the provisions of the various acts. The "certificates of indebtedness" were to be paid out of the Depositors' Guaranty Fund, replenished by the regular and emergency assessments, and by the liquidation of the various failed banks.

The operation of the law in this particular was found to be tedious and slow, and depositors were compelled to wait a considerable time before payment could be made of the "certificates of indebtedness" issued pursuant to the terms thereof. The Legislature of 1913 (ch. 22, sec. 6, S. L. 1913, p. 29, sec. 4162, C. O. S. 1921) undertook to remedy this situation by enacting the provisions above quoted as a substitute for the prior existing provisions. It was still the manifest purpose to pay immediately in full the depositors of a failed bank in cash, and to make the proper regular and emergency assessments to replenish the fund against the various institutions which had complied with the provisions of the law. But a new theory was promulgated by the law of 1913. The provision theretofore existing for the issuance of "certificates of indebtedness" to the depositors of failed banks was repealed by substitution and a definite plan was incorporated whereby the Depositors' Guaranty Fund could be immediately and forthwith replenished, and the depositors could be immediately paid in full in cash. By the provisions of the 1913 act the Banking Board was authorized to issue "Depositors' Guaranty Fund warrants," bearing six per cent. annual interest from date, in numerical order, to be retired in like order, constituting a charge and first lien upon the Depositors' Guaranty Fund when collected, as well as a first lien against the capital stock, surplus, and undivided profits of the various complying banks to the extent of the liability of such banks under the provisions of said act; the act further providing—"and said Banking Board shall have authority to negotiate or otherwise dispose of Depositors' Guaranty Fund warrants at not less than par value in such manner as it may see fit to facilitate the liquidation of failed banks." By subdivision (g) of said section, provision was made for the Banking Board to call for payment at stated intervals all "such outstanding warrants, if any, as can be liquidated from the available funds on hand." For the first time legislative authority was given to issue instruments and negotiate the same for not less than their par value, in order to secure funds to be placed in the depleted Depositors' Guaran-

ty Fund. It is upon this class of obligations that plaintiffs seek full recovery in this action. The warrants, the basis of this action, were purchased by the various plaintiff holders pursuant to the above-mentioned provisions. The funds paid by them for such warrants went into the Depositors' Guaranty Fund, and were thereafter paid out to depositors of failed banks. By virtue of the above provision, money was borrowed from these plaintiffs to tide the Depositors' Guaranty Fund over an emergency situation.

Special attention is called at this time to the provisions contained in said act that said warrants should constitute a charge and first lien upon the Depositors' Guaranty Fund when collected and a first lien against the capital stock, surplus, and undivided profits of each and every bank complying with said law to the extent of the liability of any such bank thereunder, and that said warrants should be issued in numerical order and retired in like order. Prior to the above act there was no provision fixing a lien on the fund in favor of any holder of a "certificate of indebtedness." It is obvious that there was a well-defined purpose for the inclusion of such provision in the law. It is equally obvious that there could be no cause or reason for fixing a lien on the fund in favor of the holder of a "certificate of indebtedness" who received same in payment of his claim in the ordinary course of the operation of the law. This provision permitted the issuance of warrants, the payment of which was vouchsafed by the specific provisions of the law granting to the purchasers thereof certain preferences as above enumerated. In the absence of such a provision, the purchasers of such warrants would be placed in the ridiculous position of seeking an opportunity to pay out their cash merely for the sake of placing themselves on a parity with the depositors in a failed bank, with the attendant hazards of ultimate return of their investments. The credit of the state was not behind said warrants; but the fund was created by virtue of the provisions of statutory law in a designated manner. It is manifest that such warrants would not be readily marketable and attractive to purchasers unless proper provisions were inserted to make recompense certain for the cash invested by investors therein. It was undoubtedly the purpose of the Legislature to provide an effective means of guaranteeing repayment, with interest, of cash procured from the sale of said warrants, which intention was manifested by the lien provided in said act and

by the provision requiring issuance in numerical order and retirement thereof in like order. With the Depositors' Guaranty Fund constantly depleted, such an investment would otherwise have been positively hazardous. It is inconceivable that the Legislature intended that the warrants issued for the purpose of negotiation to secure cash would stand on the same basis as claims of depositors in failed institutions. At least, it is inconceivable that anyone would seek the hazards of such an investment.

It is evident that the 1913 act was to create a substantial change in the method of payment to depositors. Instead of issuing "certificates of indebtedness" against a depleted fund to the depositors in failed banks, to be repaid by emergency assessments if and when collected, "Depositors' Guaranty Fund warrants" were to be issued and sold and the proceeds used to pay the unfortunate depositors. There was no longer any authority to issue "certificates of indebtedness" to said depositors, for means thought to be effective, though disappointing in the future, had been provided whereby they could be paid immediately in cash. We are therefore driven irresistibly to the conclusion that section 6, chapter 22, Session Laws 1913, as above quoted, has no application whatever to checks, vouchers, certificates, warrants, orders, or by whatever designation the Banking Board might denominate them, in payment of claims of depositors in failed banks, but that the warrants referred to are the Depositors' Guaranty Fund warrants issued and sold to investors for the purpose of securing cash to pay the depositors. We think it is clear that the Legislature intended that such warrants would operate as a first and prior lien on the Depositors' Guaranty Fund, and on the regular and emergency assessments and the assets in the process of liquidation of failed banks whose depositors had been paid, and that it was the legislative intent that the Depositors' Guaranty Fund warrants purchased by such persons would take precedence in payment in the numerical order of their issuance over any other obligation of the fund.

It is noted that we are dealing with two general classes of claims against the insolvent Guaranty Fund; those claims of parties holding Guaranty Fund warrants and claims of depositors in failed banks who were not paid. As heretofore stated, there is a substantial difference between these two classes of claims, the difference

arising by virtue of section 4162, supra, which defines the rights of plaintiffs as the holders of Guaranty Fund warrants.

Defendants say, however, that the quoted provision as to issuance of said warrants in numerical order and retirement in like order is to be construed as directory and not mandatory, and in this connection it is proper to take into consideration the intention of the Legislature. City of Enid v. Champlin Refining Co., 112 Okla. 168, 240 P. 604. In the case of Bonaparte Co. v. American Vinegar Mfg. Co., 161 Okla. 54, 17 P. (2d) 441, it is said:

"* * * Requirements intended for the protection of the citizen and to prevent a sacrifice of his property, and by disregard of which his rights might be and generally will be injuriously affected, are not directory, but mandatory. French v. Edwards, 13 Wallace (U. S.) 506-517, 20 L. Ed. 702. * * *"

In the case of City of Enid v. Champlin Refining Co., supra, it is said:

"A directory provision within a statute is one the observance of which is not necessary to validity of the proceeding, and 'generally speaking, those provisions which do not relate to the essence of the thing to be done, and as to which compliancce is a matter of convenience, rather than substance, are directory, while the provisions which relate to the essence of the thing to be done, that is, to matters of substance, are mandatory.' 25 R. C. L. 766; Des Moines v. Manhattan Oil Co., 193 Ia. 1096; Thompson v. Alameda, 144 Cal. 281, 77 P. 951; Denver v. Londoner, 33 Colo. 104, 80 P. 117; People v. Sanitary Dist., 184 Ill. 597, 56 N. E. 953; State v. Douglas, 27 Nev. 469, 77 P. 986; Norman v. Thompson, 30 Tex. Civ. App. 537; Re Cusick, 10 L. R. A. 228, 136 Pa. 459, 20 Atl. 574; Troy Min. Co. v. White, 42 L. R. A. 549, 10 S. Dak. 475, 74 N. W. 236, are to the same effect and the rule appears to be universal.

"In Gallup v. Smith, 12 L. R. A. 353, 59 Conn. 354, 22 Atl. 334, the court said: 'The most satisfactory and conclusive test of the question whether the provisions of a statute are mandatory or directory, is whether the prescribed mode of action is of the essence of the thing to be accomplished: in other words, whether it relates to matters material or immaterial, to matters of convenience or substance.' "

In the light of the above authorities it is not necessary to discuss the issue further, as it plainly appears that the provision requiring warrants to be paid in their numerical order is a mandatory provision of the statute, as it involves a substantial right which would be injuriously affected if the provision is disregarded.

Problems very similar to those presented here were considered by the Supreme Court of Kansas in the case of State v. Bone, 266 P. 85. It does not appear that the Bank Guaranty Law of Kansas had been repealed at that time, but the fund was insolvent and the methods devised for the rehabilitation of the fund had virtually ceased to function. There was available only an amount sufficient to pay a small percentage of the claims of the depositors in the failed banks. It was contended that depositors in all of the failed banks should share pro rata in the Guaranty Fund. The court held against such contention and decided that the claims should be paid in sequential order for the reason that the statutes so directed, and payment on any other basis would be not only in violation of statutory direction, but a violation of constitutional law. In other words, the court was very explicit in its holding that the plain intent of the statute must be followed. The reasoning of the court therein is applicable herein.

It is further contended by defendant that such rights as accrued to plaintiffs under section 4162, supra, are not now effective since the repeal of said statute. In this connection attention is directed to section 54, art. 5, of the Constitution, which provides as follows:

"The repeal of a statute shall not revive a statute previously repealed by such statute, nor shall such repeal affect any accrued right, or penalty incurred, or proceedings begun by virtue of such repealed statute."

Since the warrants held by plaintiffs were issued as security for a loan of money to the Banking Department of the state under the statutory provisions above referred to, they partake of the nature of bonds, and the cases hereinafter cited dealing with bond issues are analogous. In the case of State ex rel. Freeling v. Howard, 67 Okla. 296, 171 P. 41, this court had under consideration the rights of bondholders who held state bonds issued pursuant to the provisions of chapter 89, Session Laws 1910-11. Under the provisions of the act, the proceeds of the sales and rentals of certain lands were pledged to the payment of the bonds. Thereafter the Legislature attempted to appropriate a portion of the funds to other purposes, and in discussing the rights of the bondholders relating to their interest in the particular funds, this court said:

"It is conceded that the provisions of said chapter 89 constitute a contract between the state and the holders of the bonds now out-

standing, and that the terms of said contract cannot be impaired by any subsequent legislation. The general rule is that, where a special fund has been pledged for use in the payment of bonds or other obligations, such fund may not be diverted to any purpose other than that to which it is pledged. Diggs v. Lobsitz, 4 Okla. 232, 43 P. 1069; Wabash & Erie Canal Co. v. Beers, 67 U. S. (2 Black) 448, 17 L. Ed. 327; Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128, 27 L. Ed. 448; Graham v. Horton, 6 Kan. 343; People v. Pacheco, 29 Cal. 210; McCauley v. Brooks, 16 Cal. 11; Edemiller v. City of Tacoma, 14 Wash. 376, 44 P. 877; State v. Cordoza, 8 S. C. 71, 28 Am. Rep. 275; Park v. Candler, 113 Ga. 647, 39 S. E. 89; Western Savings Fund Society v. Philadelphia, 31 Pa. 175; Fazende et al. v. City of Houston (C. C.) 34 Fed. 95."

In the case of McGrath v. Oklahoma City, 156 Okla. 34, 9 P. (2d) 711, it is said:

"The laws existing at the time of the issuance of municipal bonds, and under the authority of which they are issued, enter into and become a part of the contract in such a way that the obligation of the contract cannot thereafter be in any way impaired, or its fulfillment hampered or obstructed, by a change in the law."

See, also, Nelson v. Pitts, 126 Okla. 191, 259 P. 533; Perryman v. City Home Builders, 121 Okla. 150, 248 P. 605; Runnells v. Oklahoma City, 150 Okla. 292, 1 P. (2d) 740; Moore v. Otis (C. C. A.) 275 Fed. 747; Moore v. Gas Securities Co. (C. C. A.) 278 Fed. 111.

In the case of Crump v. Guyer, 60 Okla. 222, 157 P. 321, it is said:

"A 'vested right' is the power to do certain actions or possess certain things lawfully, and is substantially a property right, and may be created either by common law, by statute, or by contract. And when it has been once created, and has become absolute, it is protected from the invasion of the Legislature by those provisions in the Constitution which apply to such rights. And a failure to exercise a vested right before the passage of a subsequent statute, which seeks to divest it, in no way affects or lessens that right."

In the case of St. Louis Union T. Co. v. Franklin-American T. Co. (C. C. A.) 52 Fed. (2d) 431, 87 A. L. R. 386, the court was concerned with certain bond issues in the state of Arkansas. The Legislature, by four special acts, passed in 1911, 1915, 1919, and 1921, authorized the issuance of certain drainage district bonds. The Cypress drainage district issued four special series of bonds by virtue of the four legislative acts. The district defaulted on all four issues.

The case developed into a contest of rights of priority by the holders of the first, second, third, and fourth issues. The lower court held that all four issues were on a parity without any rights of priority as to any one of them. The holder of the first issues appealed to the Circuit Court of Appeals, and the judgment of the lower court was reversed, with directions to enter a decree sustaining the priority of the first, then the subsequent issues in order. The court therein said:

"Also, it would be a clear impairment of their contract with the district. Under the legislative authority of these acts of 1911, the district made its contract (the pledge and bonds) with the bondholders and their representative, the trustee. That contract became effective, and rights vested thereunder. Thereafter, the Legislature has no power to alter such contract rights to the detriment of those who dealt with the district upon the faith of the authority granted by the Legislature to the district. The matter is well expressed in a quotation from Droit de la Nat. L. 1, c. 6, sec. 6, contained in City of Cincinnatti v. Seasongood, 46 Ohio St. 296, 21 N. E. 630, at page 633, as follows: 'A law can be repealed by the lawgiver; but the rights which have been acquired under it while it was in force do not thereby cease. It would be an act of absolute injustice to abolish with a law all the effects which it had produced.' The same is as true of an amendment as of a repeal. To prevent just such character of injustices was one of the reasons that the Constitution (article 1, section 10, cl. 1) denied to the states the power of impairing the obligations of legal contracts. Scotland County Court v. U. S., 140 U. S. 41, 11 S. Ct. 697, 35 L. Ed. 351; Seibert v. Lewis, 122 U. S. 284, 294, 7 S. Ct. 1190, 30 L. Ed. 1161; Port of Mobile v. Watson, 116 U. S. 289, 305, 6 S. Ct. 398, 29 L. Ed. 620; Louisiana v. Pilsbury, 105 U. S. 278, 26 L. Ed. 1090; Moore v. Otis, 275 Fed. 747, this court; Town of Samson v. Perry, 17 F. (2d) 1 (C. C. A. 5); Padgett v. Post, 106 F. 600 (C. C. A. 4); Brodie v. McCabe, 33 Ark. 690. * * *"

The cause was appealed to the Supreme Court of the United States and a writ of certiorari dismissed. 286 U. S. 533, 76 L. Ed. 1274, 52 S. Ct. 642. See annotations, 87 A. L. R. 397 and 85 A. L. R. 244.

The cases cited by the defendants from the various jurisdictions in which similar problems have arisen are not controlling, but it may be helpful to consider them briefly. Defendants rely upon the Texas case of Lacy v. State Banking Board, 11 S. W. (2d) 496, which is followed by Lydick v. State Banking Board (Tex.) 12 S. W. (2d) 954, and Smythe v. Cochrane (Tex.) 14 S. W. (2d)

821. In the Lacy Case certain parties sought to establish a prior right to payment out of an insolvent deposit guaranty fund over certain other claimants, solely by reason of priority of time. It was held that the mere fact that certain claims were prior in point of time did not establish a priority for the purpose of payment, but that the funds should be prorated among all claimants. We quote from the language of the court as follows:

"* * * To our minds, the language (of the statute) does no more than indicate a priority of right as to maturity of claims for payment. The language is: 'The remainder shall be paid out of the Depositors' Guaranty Fund through the Banking Board.' There is not one word indicating an appropriation of any special fund or part of fund. The language is merely the establishment of a liability and does not make the same payable out of any particular portion of the fund. It is no more in legal effect than the final establishment of the liability of the Depositors' Guaranty Fund. It, of course, is to be implied that such liability is presently payable, but there is lacking that essential intention creating a preference by way of assignment or lien, either legal or equitable."

It is conceded by attorneys for defendants that in the event plaintiffs succeed in establishing the priority of their claims, their contentions in regard to the right to collect interest should be sustained. The authorities establish the correctness of the position taken by the parties in this regard. The case of State v. Barrett, 25 Mont. 112, 63 P. 1030, presents a state of facts very similar to the state of facts involved herein. In that case an effort was made to stop the interest on certain state warrants issued for a particular purpose by the repeal of a statute under which the warrants were issued. The court therein said:

"Where a contract was made with reference to Pol. Code, sec. 1601, which provided that, if certain state warrants to be issued in payment of work on the state school of mines building could not be paid on presentation for lack of money in the state school of mines building fund, out of which they were to be paid, they should bear interest at the rate of 7 per cent. per annum from the date of presentation, Laws 1897, p. 124, repealing Pol. Code, sec. 1601, was void as to such contract, being in conflict with Const. U. S. art. 1, sec. 10, forbidding the impairment of the obligation of contracts by state legislation, and Const. Mont. art. 3, sec. 2, to the same effect; hence the holder was entitled to interest on such warrants."

See Thompson v. Bone (Kan.) 251 P. 178; 12 C. J. 999, par. 612. Section 15, art. 2, of our Constitution likewise prevents the impairment of the obligation of a contract.

We are not unmindful of the cases of County Excise Board v. Gulf Pipe Line Co., 156 Okla. 103, 9 P. (2d) 460, and In re Protest of St. Louis-San Francisco Ry. Co., 157 Okla. 131, 11 P. (2d) 189. Those cases deal with warrants issued in payment of claims, and the definition of a contract therein relates only to a particular statute. In the instant case the warrants were issued in lieu of bonds or other negotiable securities to secure a loan of money and are contractual in their nature. Consequently, any statute which either directly or indirectly attempts to prevent the collection of interest according to the terms of the original obligation would impair the obligation of contract and would therefore be unconstitutional.

In view of our determination of the first two propositions, we deem a determination of the third immaterial.

The trial court erred in ordering the payment of all the warrants and claims on a pro rata basis, and should have ordered the warrants of plaintiffs with interest thereon paid in full.

The judgment of the trial court is reversed and the cause remanded, with directions to enter judgment in conformity with the views expressed herein.

RILEY, C. J., CULLISON, V. C. J., and SWINDALL, ANDREWS, McNEILL, BAYLESS, BUSBY, and WELCH, JJ., concur.